**METROPOLITAN OPERA
ASSOCIATION, INC.,
Plaintiff,**

v.

**LOCAL 100, HOTEL EMPLOYEES AND
RESTAURANT EMPLOYEES INTERNA-
TIONAL UNION, et al., Defendants.**

No. 00 Civ. 3613(LAP).

United States District Court,
S.D. New York.

Jan. 28, 2003.

Deborah E. Lans, Wasserman, Grubin & Rogers, LLP, Charles A. Stillman, Catherine

Easterly, Stillman & Friedman, P.C., Sharon
E. Grubin, General Counsel, New York City,
for Plaintiff.

James A. Moss, Marianne Yen, Herrick,
Feinstein LLP, New York City, for Defen-
dants.

*OPINION*

PRESKA, District Judge.

## TABLE OF CONTENTS

 I. PROCEDURAL STATUS.................................................182

 II. THE ALLEGATIONS IN THE ACTION....................................184

III. THE COURSE OF DISCOVERY..........................................184
 A. Discovery on Lynett's Watch .................................184
 1. The Met's First Document Request ........................184
 B. Discovery on Anderson's Watch ...............................186
 1. The Met's Duplicate Document Request to Bitterman .......186
 2. The Met's Second Document Request .......................188
 3. Electronic Documents ...................................190
 C. Discovery on Moss' and Yen's Watch...........................192
 1. The Met's Third Document Request—Benefits ...............192
 2. The Met's Fourth Document Request .......................193
 3. Depositions ............................................193
 a. Granfield ..........................................193
 b. Travis .............................................193
 c. Diaz................................................194
 (i) Weekly Reports ................................194
 d. Tamarin ............................................199
 (i) Subsidies .....................................199
 e. Ream ...............................................201
 (i) Payroll Department ............................201
 4. Interrogatories Regarding Affirmative Defenses .........201
 5. The Met's Fifth Document Request .......................202
 6. Compliance Discovery ...................................203
 a. Interrogatories ....................................203
 (i) Subsidies .....................................205
 (ii) Benefits .....................................206
 b. Depositions ........................................208
 (i) Granfield .....................................209
 (ii) Bitterman ....................................210
 (aa) The Union's Storage Facility ...........211
 (iii) Rimmelin ....................................211
 (iv) Lynett.......................................212
 (v) Yen ..........................................212

 IV. THE MET'S MOTION FOR SANCTIONS REGARDING THE SUBPOE-
 NAE OF THE MET DIRECTORS AND WARD'S DEPOSITION .................215
 A. The Met Directors ...........................................215
 B. Ward's Deposition............................................216

 V. DISCUSSION.......................................................218
 A. Applicable Legal Standards...................................218
 B. Sanctions Are Warranted in This Case ........................220
 1. Rule 26.................................................221
 2. Rule 37.................................................224
 a. Willfulness or Bad Faith ...........................224
 (i) The Ward Deposition ...........................226
 b. The History of Non–Compliance ......................227
 c. The Client's Complicity ............................227

 d. Prejudice ...............................................229
 e. Effectiveness of Lesser Sanctions ...............................230
 3. 28 U.S.C. § 1927 ...............................................230
 4. The Met Directors' Deposition.......................................230
 5. The Court's Inherent Power ..........................231

VI. CONCLUSION .........................................231

"A lawsuit is supposed to be a search for the truth," *Miller v. Time–Warner Communications, Inc.,* No. 97 Civ. 7286, 1999 WL 739528, at *1 (S.D.N.Y. Sept. 22, 1999), and the tools employed in that search are the rules of discovery. Our adversary system relies in large part on the good faith and diligence of counsel and the parties in abiding by these rules and conducting themselves and their judicial business honestly.

The judicial system prefers to resolve controversies on the merits. *See, e.g., Cody v. Mello,* 59 F.3d 13, 15 (2d Cir.1995); *Enron Oil Corp. v. Diakuhara,* 10 F.3d 90, 95 (2d Cir.1993). In the ordinary course, lawsuits should not be resolved based on who did what to whom during discovery. Indeed, a result driven by discovery abuse is justified only on the rarest of occasions and then only after the miscreant has demonstrated unquestionable bad faith and has had a last clear chance to comply with the rules.

Some judges come to the bench from academia, some from government service, some from private practice. Because I came to the bench from private civil practice, I am familiar with the hurly-burly of the discovery process in a hotly-contested civil case, with the existence of sharp elbows, speaking objections, rude responses and with the everpopular, much-cited Rambo litigation tactics. I am certainly familiar, both from practice and from my time on the bench, with discovery disputes that devolve into arguments about which child threw the first spitball.

The discovery process in this case, however, transcended the usual clashes between adversaries, sharp elbows, spitballs and even Rambo litigation tactics. This case was qualitatively different. It presented the unfortunate combination of lawyers who completely abdicated their responsibilities under the discovery rules and as officers of the court and clients who lied and, through omission and commission, failed to search for and produce documents and, indeed, destroyed evidence—

all to the ultimate prejudice of the truth-seeking process. As confirmed by discovery into the Union's and its counsel's compliance with the Met's discovery requests, both the lawyers and the clients exhibited utter and complete disregard for the rules of the truth-seeking process in civil discovery. As is set forth at length below (and at greater length in the papers in support of the motion):

— in response to Met counsel's continuing assertions of lack of an adequate document search and demonstrations of nonproduction, the Union's counsel repeatedly represented to the Court that all documents responsive to the Met's document requests had been produced when, in fact, a thorough search had never been made and counsel had *no* basis for so representing;

— counsel knew the Union's files were in disarray and that it had no document retention policy but failed to cause a retention policy to be adopted to prevent destruction of responsive documents, both paper and electronic;

— counsel failed to explain to the nonlawyer in charge of document production, *inter alia,* that a document included a draft or other non-identical copy and included documents in electronic form;

— the non-lawyer the Union put in charge of document production failed to speak to all persons who might have relevant documents, never followed up with the people he did speak to (instead merely picked up "Met-related" documents that some of the employees he did speak to placed in a box when they remembered to do so) and failed to contact all of the Union's internet service providers ("ISPs") to attempt to retrieve deleted e-mails as counsel represented to the Court that he would;

— no lawyer ever doubled back to inquire of the Union employee in charge of

document production whether he conducted a search and what steps he took to assure complete production;

— in the face of Met counsel's constant assertions that no adequate document search had been conducted and responsive documents had not been produced, Union counsel failed to inquire of several important witnesses about documents until the night before their depositions;

— the Union's counsel lied to the Court about a witness' vacation schedule in order to delay the witness' court-ordered deposition;

— a Union officer lied in his deposition about whether Union members working on the campaign against the Met filled out reports of their activities, and, even after the lie was discovered, all such responsive documents still were not produced; and

— shortly after Met counsel announced they might seek permission to have a forensic computer expert examine the Union's computers in an attempt to retrieve deleted e-mails, the Union replaced those computers without notice.

Though perhaps technically sufficient for relief under one or the other of the rules or statutes forming the basis of the Met's motion, any one of these discovery failures, standing alone, would not ordinarily move a court to impose the most severe sanction. Here, however, the combination of outrages perpetrated by the Union and its counsel, by both omission and commission, impels the most severe sanction in order to (1) remedy the effect of the discovery abuses, *viz.*, prejudicing the Met's ability to plan and prepare its case, (2) punish the parties responsible, and (3) deter similar conduct by others.

In so doing, I am cognizant of the relatively lengthy discussion in the Union's papers about discovery failings by the Met, the Met's motivations on this motion and the like.[1] As the referee on the ground in this engagement, however, I reject the Union's

*sub silentio* justification that the Met and its counsel participated in the same type of conduct that is the basis of the motion. To the extent that there were failings by the Met or its counsel, they were well within the normal hurly-burly of the discovery process and, in any event, were promptly addressed. The conduct of the Union and its counsel, on the other hand, transcended the hurly-burly into gross negligence, recklessness, willfulness and lying. As will be detailed below, it is this qualitatively different conduct that is sanctioned here.

## I. PROCEDURAL STATUS

Plaintiff Metropolitan Opera Association (the "Met") originally commenced this action against defendants Local 100, Hotel Employees and Restaurant Employees International Union ("Local 100" or "the Union"), its President, Henry Tamarin, and Lead Organizer, Dennis Diaz, in New York State Supreme Court on May 1, 2000, claiming that Local 100 improperly involved the Met in a labor dispute between Local 100 and Restaurant Associates Corporation ("RA"), the Met's food service provider. (*See* Orig. Compl.). On May 4, 2000, the Met obtained a temporary restraining order ("TRO") against Local 100's activities. On May 12, 2000, Local 100 removed the case to this Court and moved to dissolve the TRO. (Docket entry nos. 1, 4). After a hearing and argument, I denied Local 100's motion, continued the TRO as a preliminary injunction and granted the Met's motion to hold defendants in contempt of the TRO. *See Metropolitan Opera Ass'n, Inc. v. Local 100,* No. 00 Civ. 3613, 2000 WL 872829, at *1 (S.D.N.Y. June 1, 2000). The Court of Appeals vacated that order on February 2, 2001, finding the injunction to be impermissibly vague. *See Metropolitan Opera Ass'n, Inc. v. Local 100,* 239 F.3d 172 (2d Cir.2001).

On August 13, 2001, the Met filed an Amended Complaint, which Local 100 answered on October 4, 2001. (Docket entry nos. 21, 22). By Order dated October 24,

---

1. In light of the obvious seriousness of the allegations in the Met's moving papers on this motion, it is remarkable that Marianne Yen, the Herrick Feinstein associate primarily responsible for the Union's document production and the only lawyer who submitted an opposing affidavit for the

time period comprising the bulk of discovery, devotes three paragraphs of her responsive declaration (¶¶ 18–20) to discovery on her watch and fifteen paragraphs to the Met's perceived failings and its motivations (¶¶ 21–35).

2001, I directed that liability issues be tried prior to damage issues and that discovery with respect to liability conclude by December 31, 2001. (Docket entry no. 24). Trial initially was scheduled to commence on January 22, 2002. (Docket entry no. 26). However, due to disputes regarding discovery and to allow the Union to file a motion for summary judgment, the trial was rescheduled for April 15, 2002. (Docket entry. no 28).

By Affirmation dated December 17, 2001, the Met moved for an award of sanctions, including attorneys' fees, against defendants' counsel for their abuse of process and abuse of discovery in connection with certain subpoenae directed to members of the Met's Board of Directors. (Affirmation of Sharon E. Grubin dated December 17, 2001 ("Grubin Aff.")). At a teleconference on December 18, 2001, I ordered the defendants to respond to the Met's motion by affidavit, which they did. (Affidavit of Marianne Yen dated January 2, 2002 ("Yen Aff.")).

On February 22, 2002, Local 100 filed a motion for summary judgment to dismiss the damages claims in the Amended Complaint against individual defendants Tamarin and Diaz and the second, third, fourth, sixth, and seventh claims in the Amended Complaint. (Docket entry no. 30). After hearing oral argument on April 10, 2002, I granted Local 100's motion as to the Met's second cause of action under the Lanham Act and as to the Met's sixth cause of action, except for the alleged trespasses on the premises of the Metropolitan Opera House, and denied Local 100's motion as to the remaining claims. (Docket entry no. 56).[2] At a conference on April 10, I granted the Met's request for permission to file a motion for sanctions. Because the motion came on the eve of trial, I undertook to review it preliminarily and to give Union counsel the same opportunity before taking any action regarding the trial.

On April 11, 2002, the Met filed a motion for judgment and attorneys' fees against the Union and its attorneys,[3] pursuant to Rules 26 and 37 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and the Court's inherent power. (Docket entry no. 42). I reviewed that motion and, after hearing defendants' views by letter and teleconference, found it not to be frivolous. Accordingly, I stayed all other proceedings, including trial, to allow the parties to brief the issues. (Docket entry. no. 41).

On April 25, 2002, the Met filed a letter brief (1) following up on its December 17 application for sanctions, including attorneys' fees, regarding the subpoenaed depositions of the Met Directors, and (2) supplementing that application to request similar relief with regard to the defendants' counsel's behavior concerning the deposition of Peter Ward. (Letter from Grubin to the Court dated April 25, 2002 ("Grubin 4/25/02 Letter")). Both sides have filed briefs, affidavits and several letter submissions on these motions, all of which I have considered.[4] For the reasons

---

2. Local 100's motion to remand the case by letter dated September 26, 2002, was denied. (Docket entry no. 55).

3. Joseph J. Lynett appeared as attorney for defendants, briefly as the Union's in-house counsel (Notice of Removal dated May 12, 2000, docket entry no. 1) and then as a partner at Herrick Feinstein LLP (Substitution of Counsel dated May 24, 2000, docket entry no. 5). Michael T. Anderson and Jennifer A. Matis of Davis Cowell & Bowe LLP later appeared as additional counsel to defendants. (Notices of Appearance dated August 21 and October 2, 2000, docket entry nos. 11 and 12). James A. Moss, Darlene Fairman and later Marianne Yen of Herrick Feinstein also appeared. (Answer dated October 1, 2000, docket entry no. 22; Declaration of Marianne Yen dated May 1, 2002 ("Yen Decl.") ¶ 5). The Herrick Feinstein firm was designated on each of the docketed papers except the Davis Cowell & Bowe notices of appearance.

4. In her letter dated October 14, 2002 in further opposition to the Met's motion, Yen purports to "renew" defendants' request for an opportunity to be heard and specifically requests a hearing. Defendants, however, have not previously asked for any hearing on this motion, and thus Yen was hardly renewing any such request. I do not construe defendants' surreply made by letter dated May 22, 2002—in which, at footnote 4, Yen asked that defendants have an additional opportunity to address any new material contained in the Met's reply, if any, as to which the Court believes a response is necessary or would be helpful—as such a request. In any event, defendants and their counsel nowhere explain what disputed factual issues exist that require a hearing. (See Ex. 60 to Reply Declaration of Deborah E. Lans dated May 15, 2002 ("Lans Reply Decl."), a copy of the Lans Decl. marked to show that the assertions in the moving declaration are in large measure uncontested). To the extent that defendants intend to imply that they have

set out herein, the Met's motions for sanctions are granted.

## II. THE ALLEGATIONS IN THE ACTION

In this action, the Met alleges that the Union used "the Met's name and prestige . . . as a weapon" in both Local 100's dispute with RA and in Local 100's larger campaign to promote

> membership and power by installing the [U]nion as the collective bargaining representative of workers, both at the [Met] and elsewhere, without having to undergo a statutorily-approved, NLRB-supervised, secret-ballot election.

(Am.Compl. ¶ 1). According to the Met, since 1999, Local 100 continuously has sought to unionize the RA employees working on the Met's premises by way of a "card check" process, which is a non-statutory recognition procedure. (*Id.* ¶ 2). To further this goal, Local 100 allegedly attempted to induce the Met, through fraudulent and coercive means, "to abandon its neutral stance in the existing dispute between Local 100 and RA over the method used for recognition." (*Id.*). According to the Met, its refusal to side with the Union prompted Local 100 "to harass, intimidate, threaten, defame, and injure the Met, and thereby coerce the Met to support the [U]nion's card check procedure against RA's proposed secret-ballot election procedure." (*Id.*). More specifically, the Met asserts that Local 100 has: distributed false,

misleading and defamatory leaflets and letters about the labor dispute and the Met's involvement in it; attempted to extort the support of Met officers, employees, donors, patrons, and directors by threatening to involve them in the dispute; encouraged Met employees, donors, and patrons to boycott the Met and withhold monetary contributions; interfered with public funding of the Met; and violated court orders by demonstrating and holding rallies in and around the Met. (*Id.* ¶ 3). Furthermore, Local 100 allegedly has "willfully and unlawfully traded on the Met's name to obtain economic benefits for themselves [sic], to garner unwarranted publicity for their [sic] actions, and otherwise to trade on the Met's status, reputation, name and mark for their [sic] own gain." (*Id.* ¶ 4).

The Met's Amended Complaint asserted eight causes of action: defamation, violation of the Lanham Act, product disparagement and trade libel, unlawful secondary boycotting, tortious interference with business relations and economic advantage, trespass, *prima facie* tort, and injunctive relief.[5] (Am. Compl. ¶¶ 94–146).

## III. THE COURSE OF DISCOVERY

### A. *Discovery on Lynett's Watch*[6]

#### 1. The Met's First Document Request

The Met served its First Document Request with the Complaint on May 2, 2000, and asked for, *inter alia*, all documents that

---

not had an opportunity to be heard on the Met's motion, in fact they have submitted several voluminous papers as well as additional letters amply voicing their position. Finally, I note that the last sentence of Ms. Yen's letter asks for such an opportunity to be heard should I be inclined to find sanctionable conduct. In other words, despite their opportunity to be fully heard over the course of the last several months and their actually being heard on the motion, defendants and their counsel now ask for a second (or third or fourth) bite at the apple. They had more than sufficient opportunity to correct their deficiencies during the course of discovery and to respond to the motion. The time to face the consequences is now at hand.

5. The Met added two claims to the Amended Complaint, for violation of the Lanham Act and product disparagement and trade libel, which were not in the original Complaint.

6. Lynett appeared as Union counsel at the outset of the case in federal court and generally presided over the Union's response to the Met's First Document Request. (*See* Deposition of Joseph J. Lynett ("Lynett Dep.") at 28, Ex. 44 to Lans Decl.) ("Well, you have to understand something that I was not really involved much in discovery after that initial production on May 23rd" [2000]); 37 (no other role regarding discovery); 49–50 (never doubled back after injunction hearing to assure completeness of production); 64 (had no conversations with his successor as in-house counsel to the Union, Jamin Sewell, or with the Union's later-retained outside counsel, Michael Anderson, about the Union's discovery obligations). Lynett did not submit an affidavit in connection with this motion.

(a) "concern[ed] communications which concern the Met;" (b) were communicated to or intended to be communicated to the Met or any patron, donor, potential patron or donor, Board member, or agent of the foregoing (listing names); (c) concerned any of the foregoing; (d) concerned use or application of pressure on the Met or any of the foregoing persons; and (e) concern[ed] the Union "candlelight vigil" of March 30, 2000, the rally of May 11, 2000, or any other rally or similar event planned to occur through September 30, 2000. (Ex. 1 to Declaration of Deborah E. Lans dated April 11, 2002 ("Lans Decl.")). Joseph Lynett, who was the Union's in-house counsel at that time and soon after became an associate at Herrick Feinstein on May 15, 2000, was counsel of record. (Lans Decl. ¶ 6). At about that time, Lynett gave a copy of the Complaint and the First Document Request to Brooks Bitterman, Local 100's Research Director, and William Granfield, who at the time was the Union's Secretary/Treasurer and is now its President. (*Id.; see also* Lynett Dep. at 16–17, Ex. 44 to Lans Decl.). Bitterman is not a lawyer, and there is no indication in the record that Granfield is a lawyer.

On May 4, 2000, Justice Kapnick of the New York Supreme Court issued a TRO after a hearing, and on May 12, the Union removed the case to this Court. At a pretrial conference on May 18, I ordered the Union to produce documents on an expedited basis because the Preliminary Injunction and Contempt Hearing ("PI Hearing") was scheduled to commence on May 24, 2000.

On May 23, 2000, the day before the PI Hearing, I held a teleconference with counsel and directed the parties to produce documents to each other that day. The Met received defendants' expedited production of approximately 500–600 pages, which consisted largely of leaflets that had been disseminated by the Union and form letters that the Union had sent to donors and directors of the Met. (Lans. Decl. ¶ 8; Yen Decl. ¶ 10). According to the Met, there were virtually no internal Local 100 documents, and Local 100 neither made objections to the First Document Request nor provided a written Rule 34 Response. (Lans Decl. ¶ 8).

At the commencement of the PI Hearing on May 24, 2000, Deborah Lans, counsel for the Met, told the Court, "I have a concern about the completeness of the document production that was made to us." (Excerpts from Transcript of May 24–26, 2000 Hearing ("May 24–26 Tr.") at 22, Ex. 2 to Lans Decl.). Specifically, she noted that no letters or other communications that the Union had sent out subsequent to May 1 had been produced, even though the Met knew the Union had sent several because the Met had obtained them from third parties. When I questioned Lynett at the hearing, he said he believed that a search had been made and that all letters had been produced, (*id.* at 24–25), adding, "The union's records aren't kept in that great of order, but I have Mr. Bitterman here and I can consult with him," to which I responded, "I presume it was not he who was going to search the files," (*id.*).

In his deposition testimony of March 22, 2002, Lynett recalled meeting with Bitterman, Granfield, and Diaz in May 2000 regarding the document demands and providing them with copies of the Met's First Document Request. (Lynett Dep. at 18–19, 26, Ex. 44 to Lans Decl.; *see also* Local 100's Responses to Plaintiff's Interrogatories Concerning Compliance with Discovery Obligations ("Local 100's Responses") at 3, Ex. 54 to Lans Decl.). Lynett "instructed [Bitterman] to alert all [Local 100] staff that all Met-related documents must be retained." (Local 100's Responses at 3). Passing for the moment what a "Met-related" document is, Bitterman failed to follow this instruction in that he only alerted some Union employees, certainly not all of those who were likely to have relevant documents. Lynett also recalled that he conducted a search of Bitterman's, Diaz's, and Granfield's file cabinets for responsive documents on or about May 20, 2001, (Lynett Dep. at 30–31, 39–42, Ex. 44 to Lans Decl.), and that Bitterman and Granfield also must have done a search because they provided him with documents around that time, (*id.* at 30). Lynett, however, could not specifically recall discussing with Bitterman, Granfield, or Diaz what types of documents would be responsive, (*id.* at 26), and there

is no indication in the record that Lynett ever discussed with Bitterman or anyone else at the Union, *inter alia,* that a "document included all drafts and non-identical copies and electronically-stored documents." Lynett never doubled back after the PI hearing to assure the completeness of the Union's expedited document production, (*id.* at 49–50), and had no conversations about discovery compliance with those who replaced him, Jamin Sewell and Michael Anderson (*id.* at 64).

Two days later at the PI Hearing, on May 26, 2000, Lans again raised the issue of defendants' lack of production, citing particular items in the Met's First Document Request of May 2, 2000. (May 24–26 Tr. at 314, Ex. 2 to Lans Decl.). Lynett stated, "Your Honor, *we have turned over every document that we have except for privileged documents ... I am representing that we conducted a search, a thorough search on this matter ....*" (*Id.,* emphasis added). The colloquy continued:

> MS. LANS: I think what he is saying to you, your Honor, is he may have given me—done his best to give me the things you ordered him to give me a day early, last week—I don't believe he means to say he has responded to my discovery request.
>
> THE COURT: Counsel, have you produced ever[y] responsive document—
>
> MR. LYNETT: *Yes, your Honor, we have produced all documents responsive to that request.*

(*Id.,* emphasis added). Despite Lynett's having been presented with a last clear chance to remedy the situation by Lans' calling attention to the failures of production on May 24, compliance discovery confirmed not only that these representations in open court were false but also that a thorough search, albeit on an expedited basis, had not been conducted and, therefore, that there was no basis whatsoever for the representation.

7. In his Declaration dated April 25, 2002, ("Anderson Decl."), Anderson states that he "does not specialize in trial work or in discovery litigation," (¶ 2), that he came into the case in June of 2000 and commenced discovery activity

### B. *Discovery on Anderson's Watch* [7]

#### 1. The Met's Duplicate Document Request to Bitterman

In early August 2000, the Met served a notice for the deposition of Brooks Bitterman and attached thereto another document request addressed solely to Bitterman, which merely repeated the requests made on May 2. (Lans Decl. ¶ 13). On August 25, 2000, defendants produced documents that they said were, together with the production made in May, "*all the non-privileged documents responsive to the requests for documents* served upon Brooks Bitterman and a privilege log [which] ... covers all documents in the union's possession." (Letter from Matis to Lesser dated August 25, 2000, Ex. 3 to Lans Decl., emphasis added). Some of those documents had been generated subsequent to May, but many others predated the First Document Request. (Lans Decl. ¶ 13). Thus, Lynett's May 26 representation of full production proved to be false, and there was no explanation of why the earlier-produced documents had not been produced in a timely fashion. In any event, this August 25 representation of full production was also false and without basis.

Michael T. Anderson had assumed responsibility for supervising discovery for the defendants in August 2000. (Yen Decl. ¶ 13). Anderson's firm, Davis Cowell & Bowe LLP, filed a notice of appearance in this case on August 21, 2000. (Docket entry no. 11). At that time, Anderson instructed Bitterman to retain all documents related to the Met and to forward any responsive documents to his associate, Jennifer Matis, in Washington, D.C. (Anderson Decl. ¶ 5). According to Anderson, "Bitterman was the most logical choice to act as custodian of records because he and the researchers he supervises generated and maintained virtually all of the documents that were called for in the Met's first two sets of document requests." (*Id.*). Anderson never visited the Union's office but contented himself with talking on the tele-

in August of 2000. (¶ 4). He states that he "transition[ed]" out of the case by the end of July 2001. (*Id.* ¶ 15). Anderson never withdrew as Union counsel.

phone to Bitterman about Met-related issues. (*See id.* ¶¶ 8, 9). Passing whether Bitterman was or was not a logical choice for custodian, compliance discovery confirmed that his supposed search was incomplete and haphazard and that no lawyer ever made inquiry of him about what he did.

On February 2, 2001, Met attorney Vincent Pentima wrote to Anderson "regarding the sufficiency and propriety of the Defendants' response to Plaintiffs' First Request for the Production of Documents dated May 2, 2000 . . . in an effort to resolve matters prior to seeking the Court's intervention." (Letter from Pentima to Anderson dated February 2, 2001, Ex. 4 to Lans Decl.). Pentima stated that, although defendants maintained that all responsive documents had been produced, the evidence showed that was not the case. *He cited various types of documents which Union representatives had testified about at the PI Hearing in May 2000, but which had never been produced.* He noted specifically that, although the First Document Request was a continuing one, no documents more current than May 2000 had been produced,[8] no notes or drafts of any kind had been produced, and no documents to, from and/or about RA which mentioned the Met (except the leaflets and letters) had been provided. *He requested that defendants "conduct a thorough search and both provide written responses to our requests and a full production of documents."* (*Id.*, emphasis added).

Anderson responded by letter of February 6, 2001, stating that he had reviewed, with his client, Pentima's letter and the categories of documents referenced therein and that defendants would supplement their production to include "all new documents generated since our production in August." (Letter from Anderson to Pentima dated February 6, 2001 ("Anderson 2/6/01 Ltr."), Ex. 5 to Lans Decl.; *see also* Anderson Decl. ¶ 8). Anderson indicated that Bitterman would search the Union records for certain responsive documents. (Anderson 2/6/01 Ltr., Ex. 5 to Lans Decl.). On February 16, 2001, Anderson wrote to Pentima and indicated

that he would provide the Met with "new [Union] documents generated since our [last] production" and any other documents referenced on February 6. (Letter from Anderson to Pentima dated February 16, 2001, attached to Anderson Decl.).

On February 22, 2001, Anderson made a "supplemental production" which he said included "*all responsive non-privileged documents generated to date since the Union's production in May 2000, as well as any further responsive documents you inquired about in your February 2, 2001 letter.*" (Letter from Matis to Pentima dated February 22, 2001, Ex. 6 to Lans Decl., emphasis added). He also noted that "a file drawer of publicly available documents relating to the Met and various directors and donors" would be made available at Herrick Feinstein for inspection. (*Id.*). Compliance discovery confirmed that Anderson's February 22 representation of full production was false and was without basis.

Pentima responded on March 22, 2001 "concerning defendants' still inadequate document production." (Letter from Pentima to Anderson dated March 22, 2001, Ex. 7 to Lans Decl.). He wrote, "Once again, I call upon defendants to provide us with a complete production of their documents" and he noted as an example of what "plainly" had not been provided that *no e-mails had been produced.* (*Id.*, emphasis added). He further noted, "*It would appear that only a smattering of notes, messages and the like have been provided and we question the search made by defendants.*" (*Id.*, emphasis added). Again, he demanded a written response as required by Federal Rule of Civil Procedure 34(b) to the Met's First Document Request that had been served almost one year before. (*Id.*). In response to Anderson's letters, Pentima noted that many of the Met's objections concerned defendants' failure to comply with the Local Rules, which defendants had not addressed. (*Id.*).

Anderson responded by letter on April 10, 2001, (Letter from Anderson to Grubin, Stillman & Lans dated April 10, 2001 ("Anderson

---

8. Pentima was not precisely correct, because a handful of documents included in the August

2000 production had been generated since May.

4/10/01 Ltr."), Ex. 8 to Lans Decl.), together with a formal Response to the Met's First Document Request and a "supplemental production of documents generated since our last production in February," which only included documents from February 2001 to April 2001, (Lans Decl. ¶ 15). With respect to e-mails, he noted two that had been produced earlier and six more that were included in the current production and he *represented that these were "all [the] responsive emails stored by the Union."* (Anderson 4/10/01 Ltr., Ex. 8 to Lans Decl., emphasis added). That this representation was without basis is demonstrated by Anderson's Declaration which notes no discussion of e-mails until after May 25. (Anderson Decl. ¶ 9). Of the eight e-mails, six contained the same text, simply an advertisement by the Union of its "Workers' Rights Hearing." (Lans Decl. ¶ 15). The two pre–2001 e-mails were two that had simply come into the Union's internet site; there was not one e-mail sent by anyone at the Union. (*Id.*). With respect to Pentima's comment about the lack of notes, messages, etc., Anderson again stated, *"We have produced all non-privileged written documents in the Union's records responsive to your request."* (Anderson 4/10/01 Ltr., Ex. 8 to Lans Decl., emphasis added). The formal Response to the Met's Request was signed by Anderson and represented that "Defendants have produced all non-privileged documents responsive to [questions 1, 4–6] throughout the course of this litigation." [9] Compliance discovery has also confirmed that the April 10 representations of full production were false and without basis.

### 2. The Met's Second Document Request

On May 25, 2001, the Met served a Second Request for Documents, which was intended to encompass all that had been covered by the First Request but to be more specific so that, to the extent defendants had been interpreting the word "responsive" in a narrow way, there could be no question of what had been requested. (Lans Decl. ¶ 16; Ex. 1 to Lans Decl.). Also on that date, Charles Stillman, counsel for the Met, wrote to Anderson.

(Letter from Stillman to Anderson dated May 25, 2001, Ex. 10 to Lans Decl.). He stated, *"We are troubled by Defendants' failure to produce whole categories of responsive documents,"* giving examples of *"[a]ll internal communications concerning the Met," "[a]ll emails concerning the Met,"* "[t]he thousands of letters sent by defendants to Met directors, officers, employees, donors and patrons," *"[t]he drafts of all documents created by defendants concerning the Met,"* and "[t]he responses by RA employees at the Met to the 'Survey of Working and Living Conditions.'" (*Id.*, emphasis added).

Anderson reviewed Stillman's May 25 letter with Bitterman, "questioned [Bitterman] about all issues raised there, and reviewed with [Bitterman] what documents (subject to objections) were responsive to the Met's Second Request." (Anderson Decl. ¶ 9). Bitterman believed that only two flyers and "a handful of responses" had been sent or received by e-mail. (*Id.*). Anderson "instructed the Union to search its files for any notes relating to the Met, [and] to construct a log showing what people on the Union's mailmerge list received the letters in the record … including any documents sent by e-mail." (*Id.*). Passing again the meaning of "notes relating to the Met," there is no indication that Anderson (or anyone else) made inquiry to assure this instruction was carried out.

On May 30, 2001, the Union made a supplemental production of documents which consisted almost entirely of form letters sent in April and May 2001 by the Union to colleagues and fellow board members of boards other than the Met on which Met board members also sat. (Lans Decl. ¶ 17). However, no other documents were produced, and Stillman received no response to his May 25 letter. (*Id.*). Stillman wrote again on June 28, 2001, noting Anderson's lack of response and informing him that, unless the Met received assurance that the deficiencies in production would be corrected by July 10 (the date for response to the Met's Second Document Request), *the Met would seek appropriate sanctions with the*

---

9. Exhibit 9 to the Lans Declaration contains defendants' Rule 34 Responses to each of the Met's

Document Requests. No Response was ever made to the Met's Fourth Request.

*Court.* (Letter from Stillman to Anderson dated June 28, 2001, Ex. 11 to Lans Decl.).

Anderson responded on July 10, 2001, enclosing defendants' Responses and Objections to the Met's Second Document Request. (Letter from Anderson to Stillman dated July 10, 2001 ("Anderson 7/10/01 Ltr."), Ex. 12 to Lans Decl.). Because a pretrial conference with the Court was scheduled to be held on July 18, Anderson and Stillman agreed to meet on July 17 to discuss discovery matters. (*Id.;* Lans Decl. ¶ 18). In his July 10 letter, Anderson stated that the Union had compiled documents in response to the Met's Second Document Request, as well as further documents responsive to the First "ongoing" Request that would be made available to the Met on July 12 at Herrick Feinstein's office. (Anderson 7/10/01 Ltr. at 6–7, Ex. 12 to Lans Decl.). Anderson also responded to some of the examples of inadequate production listed in Stillman's May 25 letter. (*Id.*). Except for specific categories of items the Met's letter had mentioned, however, nothing in Anderson's letter indicated that a thorough search had been made or that any document production had been supervised or conducted by an attorney.

In its Response to the Met's Second Document Request, signed by Anderson, the Union objected to the production of clearly relevant information, apparently taking the position that unless material specifically "concerned the Met," it was outside the scope of the pleadings. (Defendants' Response to Plaintiff's Second Set of Requests for Production of Documents, Ex. 9 to Lans Decl.). Thus, for example, it deemed all communications with New York City Council members (whom the Met alleged the Union had importuned to withhold money from the Met and from the Lincoln Center Redevelopment Project because of the RA situation at the Met) and communications concerning the food and beverage service at Lincoln Center facilities (all of which are run by Restaurant Associates and, except for the Met, unionized by Local 100) as not relevant. (*Id.,* Response to Request No. 9). In

response to a request for documents concerning the Union's retention, storage, or deletion of e-mails or of communications or drafts thereof, defendants objected that, because it was Document Request No. 26, it exceeded that numerical limitation imposed by the Local Rules, giving no further information. (*Id.,* Response to Requests Nos. 26 & 27). Coming as it did after repeated questions by Met counsel about the Union's document retention procedures, especially relating to e-mails and counsel's early admission that "[t]he Union's records aren't kept in that great of order . . . ," (May 24–26 Tr. at 25, Ex. 2 to Lans Decl.), this response, although technically correct, is wholly inconsistent with counsel's obligations to conduct discovery in good faith.

When Met counsel went to inspect the items made available at the Herrick Feinstein office on July 12 and received the production to which Anderson had referred, they found that many documents were being produced that were clearly responsive to the Met's First Request served 15 months earlier. (Lans Decl. ¶ 21). The production contained documents dating from 1999 to the then-current date, and the Met received no information as to which Union files they had come from or why they had not been produced earlier.[10] (*Id.*). On July 12, defendants also produced the e-mail log that Anderson had directed the Union to reconstruct in May. (Anderson Decl. ¶ 9).

Counsel for both sides scheduled a meeting on July 17 to discuss these matters, but as soon as the July 17 meeting began, Anderson informed Met counsel that defendants were obtaining "new" attorneys and, therefore, he would not speak about the Union's document production because that would be up to the "new" attorneys. (Lans Decl. ¶ 23). Anderson would not discuss matters further, stating that he believed the Union's production was complete and that Met counsel could raise any problems with the Court the following day. That supposedly new counsel were to appear did not, however, prevent Anderson from discussing what he viewed as

---

**10.** In fact, the Met later learned that Brooks Bitterman had *created* subject-oriented files for the purpose of the production. (*Id.* ¶ 21 n. 8;

Deposition of Brooks Bitterman ("Bitterman Dep.") at 524–26, Ex. 42 to Lans Decl.).

deficiencies in the Met's production of documents. (*Id.*).

At the conference with the Court the following day, the Union introduced its new attorneys at Herrick Feinstein, the firm that had been the attorneys of record for the Union before Anderson's first contact with the case in June 2000 and had continued, together with Anderson, as the attorneys of record. (*See supra* n. 3). Met counsel began to explain the inadequacies in defendants' discovery compliance, but Anderson stated that he could no longer speak to the point, and the Herrick Feinstein lawyers stated that they were not yet familiar with the situation. While perhaps warranted in situations where genuinely new counsel are substituted, under the circumstances here where the Herrick Feinstein firm had been counsel of record throughout, such cat-and-mouse conduct is not consistent with counsel's obligation to engage in discovery in good faith.

### 3. Electronic Documents

During the July 18 conference, I overruled essentially all of the defendants' objections to specific document requests. Anderson stated that he had not specifically instructed the Union not to delete computer files and that no retention procedure had been put in place. Met counsel also explained that, apparently, no attorney had conducted or supervised the Union's document production and, three months before the then-fixed close of discovery, the Met was unable to take depositions and develop its case because of defendants' failure to make proper disclosure. In response to the Met's concerns about how document discovery had been conducted, defendants' counsel stated that they would look into it. I directed defendants' counsel to clarify immediately with their clients that all documents relevant to the Met's document requests must be preserved, expressly making the order applicable to all work done on computers and all information sent out or received through computers. (Lans Decl. ¶ 25; *see also* Anderson Decl. ¶ 10). In that conference, Union counsel undertook that all of the Union's ISPs would be contacted in an effort to retrieve deleted electronic docu-

ments. (Lans Decl. ¶ 26). Compliance discovery later revealed that some but not all ISPs were contacted.

At that time, Anderson "mistakenly believed that e-mails are always automatically stored on the user's server" and he "had not specifically focused on e-mails in [his] original [instructions to his client]." (Anderson Decl. ¶ 10). After the July 18 conference, Anderson asked Bitterman whether e-mails were automatically stored, and Bitterman directed Anderson to check with Union staff members Dahlia Ward and Michelle Travis. (*Id.*). On July 20, Anderson called Ward and Travis, learned that the Union's staff's servers did not store e-mail after 30 days and "instructed them and Brooks Bitterman to ensure that all staff immediately made all possible adjustments to save e-mail" or to print out hard copies of responsive e-mails and to reconstruct information about e-mails that had not been saved on a log. (*Id.* ¶ 11). Between July 18 and 30, Anderson "repeatedly" asked Bitterman, Travis, and Ward whether there were responsive internal e-mails among them or to other researchers and "emphasized" that any such e-mails must be either produced or disclosed as lost. (*Id.* ¶ 12). Anderson further "directed that all union staff make hard copies of all responsive incoming and outgoing e-mails, and place them in a box for production" and he "repeated the scope of discovery obligation to include all documents, drafts, e-mails and other materials defined in Plaintiff's Document Requests." (*Id.* ¶ 13). Although Anderson states that he "repeated" these instructions, he nowhere states where, when and to whom he gave the initial instruction.

On July 23, Anderson wrote to Met counsel concerning these issues stating, "At my instruction, the Union staff have now gone through their computers to see if any e-mails had been overlooked, and to compare the hard copies in our production to identify any missing e-mails." (Letter from Anderson to Stillman & Easterly dated July 23, 2001, Ex. 13 to Lans Decl.). Furthermore, Anderson wrote, "My clients understand that they have a duty to retain all Met-related documents. To date, my instructions have been communicated to the Union staff through Brooks Bit-

terman. He has asked all staff to forward copies of all Met-related documents to be placed in a box for our periodic rolling production." (*Id.*). He additionally stated:

> Some of the union staff's servers have not been programmed to automatically retain e-mails indefinitely. All staff will now make the necessary adjustments to reprogram their servers to retain all e-mails on the server automatically.

(*Id.*). He further explained that the Union had "retrieved" most of the deleted e-mails—that is, to the extent Union staff knew of e-mails they had sent, they contacted the recipients and asked for copies which the recipients might have retained. (*Id.*). In other words, he explained, where mass mailings had occurred of notice of the May 11 and September 25 rallies the Union held against the Met and the Union had the "mail-merge" list of addresses, it contacted those addressees. Anderson understood that the Union would be contacting its ISPs to see whether e-mails could be retrieved from their servers. (*Id.*). Although Anderson took some steps to follow up on his various instructions concerning e-mails and other electronic documents, (*see* Anderson Decl. ¶¶ 11–14), he ended his involvement in the case in July, and the remaining follow-up fell between the cracks. For example, Bitterman contacted some but not all of the Union's ISPs.

On July 26, 2001, Stillman wrote to defendants' counsel and pointed out certain problems with the response given in the July 23 letter. (Letter from Stillman to Saltzman & Anderson dated July 26, 2001 ("Stillman 7/26/01 Letter"), Ex. 14 to Lans Decl.). Among these were the meaning of *Met-related documents as opposed to documents requested and relevant to the case, the failure to address computer files other than e-mails, and the failure to explain adequately the e-mail situation and to comply with the Court's ruling.* (*Id.*). Anderson responded on July 30, (Letter from Anderson to Stillman dated July 30, 2001 ("Anderson 7/30/01 Letter"), Ex. 15 to Lans Decl.), stating that with regard to the term "Met-related documents," his instructions to his clients "encompass Plaintiff's First Set of Document Requests and the further documents memo-

rialized in your July 18 letter," (*id.*). Anderson did not clarify what he told his clients constituted "Met-related documents;" he referred to the Met's First Document Request, but not the Second, and he referred to the Met's July 18 letter which only identified a few specific categories of documents that had been addressed by the Court at the conference that morning. (*Id.*). With respect to e-mails, Anderson said that only one Union staff member, Dahlia Ward, had an internet account that retained e-mails. He further stated:

> The Union found the e-mails of Dahlia Ward and Michelle Travis when counsel Michael Anderson directly contacted union staff about e-mails last week. Prior to last week, this inquiry had been conducted by Brooks Bitterman. *Bitterman had overlooked Ward in asking union staff about e-mails.* Michelle Travis recalled rally notices from May and September, 2000 and a small number of other e-mails, and realized they had not been retained nor produced in the last production.

> * * * * * *

> The Union has retrieved missing e-mails by contacting the known addressees. It has also contacted the internet service providers, who to date have advised that deleted e-mails cannot be recovered.

> * * * * * *

> My clients understand that their obligation extends to documents created on computer, whether at the Union office or elsewhere. *The Union has provided all responsive information in its hard copy files and in its computers.*

(*Id.*, emphasis added). Compliance discovery confirmed that this representation was also false in that, *inter alia*, all ISPs had not been contacted, all Union computers had not been searched, all responsive documents had not been produced, and all files had not been searched, *e.g.*, files destined for or in the Union's document storage facility.

In late July and early August 2001, the Union produced more documents, including "retrieved" e-mails. (Lans Decl. ¶ 32; Anderson Decl. ¶ 11). Local 100 produced additional documents later in August and in

September. The documents dated back to 1999 and, except for a small number of recent ones, should have been produced earlier.[11] (*Id.*).

### C. Discovery on Moss' and Yen's Watch

In mid-October 2001, Marianne Yen, an associate who had just joined the Herrick Feinstein firm, learned that she would be assisting James A. Moss, a partner at the firm, with completing discovery and preparing for trial. (Yen Decl. ¶ 5). Moss' and Yen's watch extended through the present motion.

#### 1. The Met's Third Document Request—Benefits

The Met's Third Document Request dated October 2, 2001, requested documents "concerning the benefits which Local 100 provides or has provided to its members or their families, including but not limited to health benefits, life insurance, disability benefits, and pension and/or savings plans." (Ex. 1 to Lans Decl.). In a response dated October 26, 2001, signed by Moss, the Union stated that "there are no responsive documents." (Ex. 9 to Lans Decl.). In her Declaration, Yen reiterated that "this category of documents does not exist, because benefits are paid not by Local 100, but rather by the employers...." (Yen Decl. ¶ 37(B)). Yen also stated that she "personally questioned each employee of Local 100, including the receptionist, and all have stated unequivocally that they have not seen any documents such as the Met has requested, nor have they maintained any such documents in their files. [She] searched various file drawers of Local 100's office where these documents might theoretically be kept and did not discover any." (*Id.*).

Passing for a moment that compliance discovery demonstrated that Ms. Yen did not interview every employee of Local 100 and made only a cursory search of the Union's files, (*see* Lans Reply Decl. ¶ 29; Deposition of Marianne Yen ("Yen Dep.") at 17–18, 79, 82–83, 86, 106, Ex. 46 to Lans Decl.), other discovery responses demonstrate that the representations that there are no responsive documents are untrue. For example, Granfield testified that he keeps files ("staff member files") in which documents concerning inquiries about hours, pay and the like from Union members are kept. He further testified that he has not provided that file to anyone in connection with document production. (Deposition of William M. Granfield ("Granfield Dep.") at 122–24, Ex. 69 to Lans Reply Decl.). Margaret Rimmelin (the Union's "Office Manager") testified that from time to time Tamarin received member inquiries *regarding benefits and sometimes responded by letter.* (Deposition of Margaret M. Rimmelin ("Rimmelin Dep.") at 26–27, Ex. 45 to Lans Decl.). The files and computer of the person who typed Tamarin's correspondence, Ms. Palacios, have not been searched. Also, documents that have been produced refer to discussions, inquiries and meetings between and among Local 100 personnel concerning benefits. (*See* Executive Board Minutes and Membership Meeting Minutes ("Minutes"), Ex. 69 to Lans Decl.). These Minutes refer, for example, to Report of New Benefits (10/23/99), Local 100 Welfare Fund Meeting to be run by Tamarin discussing changes to medical, dental and pension benefits (3/4/00), report reviewing new/improved benefits (7/12/00), discussion of new pension plan (8/22/00), announcement of meeting with GHI (healthcare provider) (10/31/00), discussion of pension benefits and GHI (1/22/01), report concerning benefits and funds (1/30/01). There is no explanation by Moss of the basis for the untrue response he signed stating that there were no responsive documents.[12]

---

**11.** Because none of the Union's productions was organized in accordance with Fed. R. Civ P. 34(b), which requires the production of documents either as they are kept in the ordinary course of business or by document request, (*see also* n. 10, *supra*), the Met could not know which files had been searched, who the custodian of a particular document had been, or whether a proper search had yet been made. (Lans Decl. ¶ 32 n. 12).

**12.** The Met's Third Request instructed that if a responsive document was withheld from production or had been destroyed, the circumstances thereof should be explained. (Plaintiff's Third Set of Requests for Production of Documents, Instr. a & b, Ex. 1 to Lans Decl.). The Union's

### 2. The Met's Fourth Document Request

The Met's Fourth Document Request dated October 23, 2001 was never responded to because one associate was transitioning out of the case and another transitioning in. (*See* Letter from Yen to the Court dated May 22, 2002 ("Yen 5/22/02 Ltr.") at 5). Moss, the partner in charge during that period, is silent.

### 3. Depositions

The Met began depositions six weeks before the scheduled discovery deadline, when it believed it had obtained enough information to do so. (Lans Decl. ¶ 33).

#### a. Granfield

On October 16, 2001, the Met deposed William Granfield, the Union's soon-to-be President (as of October 27, 2001). At the deposition, Granfield explained that Bitterman had the responsibility for searching for and producing documents pursuant to the Met's requests. (Granfield Dep. at 120, Ex. 69 to Lans Decl.). Granfield testified that he was shown the Met's Document Requests (although not given copies) and that he turned over his file "with respect to the campaign at the Met." (*Id.* at 123). He did not turn over some of his other files, which included, for example, those containing media materials and correspondence with the International. (*Id.* at 122–26).

The following day, Met counsel sent a letter to defendants' counsel, (Letter from Easterly to Fairman dated October 17, 2001, Ex. 16 to Lans Decl.), identifying files that Granfield had withheld, *noting once again that no files apparently had been reviewed for production by an attorney,* and stating:

All of these files appear likely to contain responsive material. Furthermore, we can only assume that if Mr. Granfield was allowed to withhold files from review, other officers and/or employees may have acted similarly.

In order to bring the union in compliance with its discovery obligations, please re-view *all* of the union's files to determine if they contain responsive documents.

(*Id.,* emphasis in original). On November 2, 2001, Yen responded, stating that Granfield's files had not been produced "because a review of those files revealed no relevant documents" but not responding to counsel's complaint that no attorney had reviewed the Union's files. (Letter from Yen to Easterly dated November 2, 2001, Ex. 17 to Lans Decl.). On November 7, 2001, Met counsel responded, noting that Granfield had testified that as of the date of his deposition on October 16, those files had not been reviewed to determine if they contained responsive documents. (Letter from Stillman & Easterly to Yen dated November 7, 2001, Ex. 18 to Lans Decl.). Second, the letter noted again,

[A]fter Mr. Granfield admitted that all of his files had not been examined, we asked your firm to review *all* of the union's files to bring the defendants into compliance with their discovery obligations. *Your letter does not state whether a union-wide review of files by an attorney has taken place.* Please confirm that, subsequent to October 16, 2001, such a review has been conducted.

(*Id.,* latter emphasis added). Yen responded on November 13, 2001, (Letter from Yen to Easterly dated November 13, 2001, Ex. 19 to Lans Decl.), disputed the content of Granfield's testimony and then confirmed that Granfield had been asked to review those files after his deposition and found no documents responsive to the Met's Document Requests. Yen said nothing, however, about whether there had been a review of the Union's files in any organized way or under the supervision of any attorney. (*Id.*).

#### b. Travis

On November 8, the Met deposed Michelle Travis, a Union researcher. Travis testified that Local 100 holds regular weekly or bi-weekly staff meetings. (Deposition of Michelle R. Travis ("Travis Dep.") at 90, 101–02, Ex. 49 to Lans Decl.). She said this case, including the meaning of the Court's injunc-

---

response did not indicate that responsive documents were being withheld or had been destroyed. (*See* Defendants' Response to Plaintiff's

Third Set of Requests for Production of Documents, Ex. 9 to Lans Decl.).

tion, and the Union's campaign against the Met were discussed at such staff meetings. (*Id.* at 91–97, 100–01). No minutes or notes of such meetings had been produced, even though Travis testified that she, for one, sometimes took notes. (*Id.* at 101). In addition, Travis was told at some point to print out e-mails and turn them over to Bitterman for this case but had no recollection of when she was told to do so. (*Id.* at 104). She turned them over to Bitterman when he asked, which he did perhaps about every two weeks. (*Id.* at 106). In any event, although Travis said she was instructed to turn over e-mails, she admitted she had "forgotten" about it. (Travis Dep. at 105, Ex. 49 to Lans Decl.). She was never told to set her computer to save any e-mails until the Summer of 2001 (presumably as a result of the July 18 court conference), so e-mails were not retained unless Travis happened to print them out. (*Id.* at 113–14). At some point prior to the Summer of 2001, her computer crashed, and she got a new one. (*Id.* at 113). When testifying about e-mails that were received in response to Local 100's campaign against the Met on Local 100 websites, Travis explained that her computer is not connected to a printer, so when she finally went to produce such e-mails, she cut and pasted them into a Word document, put the new document on a disk and went to another computer to print it out. (*Id.* at 198–99). When asked, "You could have hooked your computer up to a printer though, right?," she answered, "Yeah, but I have not done that yet." (*Id.* at 199). Further, although Travis sent many letters out, she did not think she was required to keep copies of the actual signed letters, as long as she had a master "form" letter. (*Id.* at 202–03). For example, in the space of two days in March 2001, letters signed by Tamarin and personally addressed to each recipient were sent out to members of the New York City Council's Parks, Cultural Affairs, Finance and Labor committees, but no copies of these letters were made. Thus, when the Met asked Travis to whom the letters were sent, Travis relied solely on her memory and on notes Bitterman had written on top of the letters when they were produced based on Travis' recollection. (Travis Dep. at 203–09, Ex. 49 to Lans Decl.). Travis testified that

"hits" to the Union's three websites, lincolncenterwatch.com, metoperacritic.org and metoperawatch.com, could be obtained from the site host (Yahoo) only by Local 100. The Union simply had to request the data from Yahoo. (*Id.* at 258–60). Apparently, that request was never made.

#### c. Diaz

##### (i) Weekly Reports

On November 15, 2001, the Met deposed Dennis Diaz, Lead Organizer of the Union and an individual defendant in this action, about "Weekly Reports." Weekly Reports show the daily activity of every Union employee, with the sole alleged exception of Bitterman. (Lans Decl. ¶ 37). The employees record their activities on a daily basis indicating when they meet with Restaurant Associates workers, leaflet (and the locations thereof), lobby politicians, hold rallies and demonstrations, draft speeches and so forth. In the case of Granfield, the reports (which, it was later learned, he sent to the International Union office because it paid him directly) also track, on a weekly basis, the number of RA workers at the Met who have signed "cards"—a figure used frequently in defendants' challenged leaflets as a supposed measure of worker support. (*Id.*).

Several of plaintiff's document requests called for production of the reports. (*E.g.,* Plaintiff's First Document Request Nos. 1 (which requested "[d]ocuments concerning communications which concern the Met"), 4, 5, 6 (served May 2, 2000); Plaintiff's Second Document Request Nos. 7, 9, 19, 27 (served May 25, 2001), Ex. 1 to Lans Decl.). However, these reports were never produced or otherwise made known in document production or deposition testimony. Contrary to the later-revealed facts just noted, at Granfield's first deposition, held October 16, 2001, he stated:

Q: In the period from January 1999 to the present *have you* or Mr. Tamarin *provided any written reports* to your knowledge *to the International with respect to your activities?*

A: *I haven't provided any written reports.* I don't know about Henry [Tamarin].

(Granfield Dep. at 98, Ex. 43 to Lans Decl., emphasis added). Granfield also testified:

Q: *Are there pieces of paper that are in your files that would indicate that you tally up what the vote would look like from time to time?*

A: *No.*

Q: Is that the job of any organizer to do?

A: No.

(*Id.* at 137, emphasis added).

On July 11, 2001, Diaz, in sworn testimony before the NLRB in a proceeding the Union brought against Lincoln Center, stated:

Q: Do you keep a diary?

A: No.

Q: Do you keep a calendar of your appointments?

A: A calendar of what's going on, yes. But I don't save them.

Q: *Do you log what you do on a day-to-day basis? Your activities on behalf of Local 100.*

A: *No.*

(Ex. 20 to Lans Decl. at 100, emphasis added).

Exhibit 57 to the Lans Declaration is Diaz's Weekly Report for the week ending July 14, 2001. In his deposition on November 15, 2001, however, Diaz testified with regard to the Weekly Reports as follows:

Q: Do you see to the left of where it says cafeteria it says report?

A: Yes.

Q: What does it mean?

A: Could be, had to do with my reports, my daily reports. I can't remember—

Q: *What are your daily reports?*

A: *Office reports that we fill in at each week we fill out reports.*

Q: *What are those reports about?*

A: *The weekly work that was done.*

Q: What do those reports look like? Have we seen any of them today?

A: No.

Q: Are they on a form? Is that a form that you fill in?

A: It is a weekly report. Legal paper.

Q: Do you give it to somebody?

A: Yes.

Q: Who do you give it to?

A: To one of the secretaries from the office is in charge.

Q: Whose name is?

A: Mary. I forgot what her last name is.

Q: Are you trying to remember Mary's last name?

A: No, I can't remember her last name.

\* \* \* \* \* \*

Q: Do the research people prepare weekly reports and give them to Mary?

A: I think so, yes.

Q: Do you know whether Mr. Granfield before he became president made weekly reports?

A: I think so, yes.

Q: Does Mary keep all of those in a file together? Is that the idea?

A: Yes.

(Deposition of Dennis Diaz ("Diaz Dep.") at 132–35, Ex. 50 to Lans Decl., emphasis added). On the record immediately following Mr. Diaz's revelation, Lans stated:

MS. LANS: ... Needless to say, Ms. Yen, those would have been called for by any number of our document requests. We've never seen them and I would call for their immediate production.

MR. MOSS: We'll put them on the list of things for us to discuss with respect to immediate production.

MS. LANS: You can say what you want to say. I think that from—

MR. MOSS: And we have. And we have.

MS. LANS: —from May of 2000 they are documents that should have been produced to us.

(*Id.* at 135.)

In his March 25, 2002 deposition, after the existence of the Weekly Reports was revealed,[13] Granfield testified:

---

13. Exhibit 56 to Lans' Declaration is Granfield's Weekly Report for the week ending Saturday, October 20, 2001, which Granfield signed on October 20, and which the Met received from defendants' counsel on December 28, 2001. (Lans Decl. ¶ 38). Under the heading calling for

Q: Mr. Granfield, the first question is simply *are Exhibits 18, 19 and 20 all reports that you prepared and provided to the International on an essentially weekly basis* during 1999, 2000 and 2001?

A: *Yes.*

Q: *They're reports on your activities?*

A: *Yes.*

(Granfield Dep. at 434, Ex. 43 to Lans Decl., emphasis added). With copies of his Weekly Reports in front of him, displaying that he submitted a weekly tally of worker cards as part of those reports, Granfield testified:

Q: Now, can you turn to the second page of that week?

There's a form there, it's a box, it's headed specific activity and then there's a box below that that's called organizing campaigns in representation cases.

A: Yes.

Q: In each of the weekly reports that you prepared was there an entry made with respect to any organizing campaign or representation case that was active in this box?

A: Yes. . . .

Q: Now, *is the information that's reported in this box called organizing campaigns and representation cases on a weekly basis information about* each of your active organizing campaigns, the number of workers at the unit, the number of committee members at the unit and *the number of authorization cards that have been signed at the unit?*

A: *Yes.*

Q: In order to provide this information each week and in particular I mean with respect to the Met Opera which if you were to look at this report page after page you would see you supplied information on every week, did you take a tally of the number of authorization cards that have been signed each week?

A: I would ask the organizer.

Q: So every week you would have a conversation with the organizer about how many cards have been signed?

A: Most weeks, yes.

(*Id.* at 452–54, emphasis added).

In attempting to explain his apparently perjurious testimony denying that he provided written reports to the International with respect to his activities, Granfield stated: "[t]he transcript reveals at most that Ms. Lans [who deposed Granfield] and I were not on the same wavelength concerning the scope of the questions she asked." (Affidavit of William Granfield dated May 1, 2002 ("Granfield Aff.") ¶ 2). Granfield does not consider his weekly time records to be "written reports to the International with respect to [his] activities." (*Id.* ¶ 3). Rather, the reports instead account for his time "using general phrases or words to explain where [he] ha[s] been during each day of a pay period." (*Id.* ¶ 4). When he was deposed, Granfield said, he thought that Lans was "seeking to ascertain whether [he] ever sent substantive reports about [his] union activities to the International." (*Id.* ¶ 5). Moreover, the "tally" that the Union kept merely was to record the number of RA workers at the Met who supported the card check process by signing authorization cards. (*Id.* ¶ 9). By signing the cards, the workers were not voting in an NLRB election and, according to Granfield, the tally therefore did not have anything to do with projecting votes in an NLRB election. (*Id.* ¶ 10).

On November 21, the day after Granfield's first deposition session, Met counsel wrote to Union counsel, stating, "We write to voice our *grave concern that defendants continue to withhold documents that are clearly responsive* to our discovery requests . . . ." (Letter from Stillman & Easterly to Yen dated November 16, 2001, Ex. 21 to Lans Decl., emphasis added). The Met asked for immediate production of the Union staff's Weekly Reports and *asked, again, for a review of the Union's files by Union counsel.* (*Id.*). The Met further stated:

Based on Mr. Granfield's failure to turn over files for review that likely contained responsive documents, and based on the

listing of "current active campaigns," the first page of the Weekly Report shows the "vote" of the workers that week, and the second page

shows Mr. Granfield's activities each day of that week. (*Id.*).

revelation at Mr. Diaz's deposition that Mr. Diaz and other Local 100 officers create "weekly reports" of their activities that have never been turned over to the Met, we have serious concerns about the completeness of the entirety of defendants' production. Although this is the third time that we have written you about this matter, you still have not provided us with any assurance that an *attorney* has reviewed *all* the Union's files to determine if they contain documents responsive to the Met's discovery requests.

(*Id.*, emphasis in original).

In a letter to the Court responding to one of defendants' letters, Met counsel, after addressing the issues raised by defendants, informed the Court that the Met had a number of issues about defendants' continued noncompliance with their discovery obligations:

> *The most troublesome, and possibly leading to a request for preclusion, is defendants' continuing failure to comply with simple blackletter discovery obligations.* We previously had to bring to your attention that defendants, over one year after the start of this litigation and service of our discovery requests, had *never made a proper search and were routinely deleting responsive documents from their computers.* We have since been informed by defendants that many deleted files cannot be recovered. It is undisputed that relevant information was thus lost to us. Since depositions of union principals and employees began about a month ago, we have now learned of *additional critical documents that continue to be destroyed* as well as of the existence of an untold number of potentially critical documents that were never produced due to defendants' *counsel's failure still to do a proper search* and otherwise comply with their obligations under the law.*

---

* For example, defendant Dennis Diaz, lead organizer of the [U]nion, testified last week that each union organizer and researcher working on the campaign against the Met wrote weekly re-

ports of his or her activities. These have gone unreviewed by defendants' counsel and unproduced.

(Letter from Grubin to the Court dated November 19, 2001, emphasis added).

In response to the various letters, I directed counsel to confer and report to me in writing on November 27. On November 27, the parties sent separate letters to the Court. Met counsel wrote:

> Defendants have refused to certify that a complete search of the union's records has been made *by counsel* for documents responsive to the Met's various document requests.
>
> This refusal is profoundly troubling to the Met. Some examples of our problem were brought to light at recent depositions of Local 100 employees. The Met learned of the existence of "weekly reports" that organizers and researchers of the union's campaign against the Met are required to submit to the union, as well as whole files not reviewed or produced. The problem appears to be the defendants' method of "searching" for documents—without the benefit of the Met's documents requests themselves, certain of Local 100's lay-employees were asked to search their own files and select what was to be given to counsel; other employees apparently were not even asked to review their files. We were thus told last evening, for example, that the "weekly reports" were in the union's payroll department, which was not searched. It goes without saying that simply allowing lay-employees to select what to provide to counsel is not adequate compliance.

(Letter from Stillman & Easterly to the Court dated November 27, 2001 ("11/27/01 Stillman & Easterly Ltr."), Ex. 23 to Lans Decl.). In a footnote Met counsel informed the Court that defendants had now agreed to produce the "Weekly Reports," although they continued to claim that they were not relevant or responsive to any Met document request. (*Id.* at 2 n. 1).[14] The Met asserted

---

**14.** Union counsel's position that the Weekly Reports were not responsive or relevant is wholly without merit. One need only compare the first request in the Met's First Rule 34 Request,

"[d]ocuments concerning communications that concern the Met," (Ex. 1 to Lans Decl.), to a Weekly Report (*e.g.*, Ex. 56 to Lans Decl.). For example, page one of Granfield's Weekly Report

that defendants' position of the Reports' non-relevance "raises further concern about the completeness of defendants' production." (11/27/01 Stillman & Easterly Ltr. at 2, Ex. 23 to Lans Decl.).

The Stillman & Easterly Letter also provided a last clear chance to the Union and its counsel on benefits. At page 2, Stillman and Easterly note that while the Union maintained that no benefits documents (responsive to the Met's Third Document Request) exist, "minutes of local 100 Executive Board Meetings specifically reference both meetings about member benefits and efforts by Local 100 to improve these benefits." (Id.). No responsive documents were ever produced.

When the Union only produced Diaz's and Hoffman's Weekly Reports and an updated privilege log on November 26, 2001 (Letter from Yen to Easterly dated November 26, 2001, Ex. F to Yen Decl.), Met counsel wrote a letter to defendants stating, "Your failure to produce all of the weekly reports created by Local 100 officers and employees (and your vacillating responses to our request for these documents) is inconsistent with a good faith effort to comply with your discovery obligations," (Letter from Easterly to Yen dated November 29, 2001, Ex. 24 to Lans Decl.). The Met further listed specific requests to which the reports were responsive. (Id.).

In response, instead of looking to whether the Weekly Reports were or were not responsive to any outstanding document request, Yen stated that defendants believed that the reports had not been previously asked for because "[t]hey conceivably could be considered a 'schedule' and thus such reports were produced for the particular employees from whom schedules were sought and who submitted these weekly reports." (Letter from Yen to Easterly dated November 29, 2001, Ex. 25 to Lans Decl.). As was later learned, Yen decided, apparently unilaterally and certainly without informing Met counsel, not to produce all the Weekly Re-

ports regarding the Met campaign on this narrow, stilted basis. Nevertheless, Yen stated that the Union would produce the Weekly Reports "for Local 100 employees who worked on the Met Opera campaign." (Id.). Compliance discovery confirmed that even this last clear chance was rejected, and such production was never completed.

Easterly wrote to Yen on December 4, 2001, noting that the Met had not yet received any further production and that the Weekly Reports should be produced immediately for all Local 100 employees who participated in any way in the campaign against the Met, (Letter from Easterly to Yen dated December 4, 2001, Ex. 26 to Lans Decl.), and on the same day Easterly told Yen that, in addition, monthly reports were required to be submitted by Local 100 to the International, yet none of those had ever been produced, (Lans Decl. ¶ 47). On December 5, defendants produced some additional Weekly Reports. (Id.).

Easterly wrote letters to Yen on December 10 and December 11 regarding several specific areas in which the defendants had failed to produce documents. (Letters from Easterly to Yen dated December 10 ("Easterly 12/10/01 Letter") & December 11, 2001, Exs. 27 & 28 to Lans Decl.). Among Easterly's written and previously telephoned requests were those documents concerning Tamarin, whose deposition was scheduled for December 11. On December 10, Easterly wrote:

As noted in our previous correspondence, the weekly reports submitted by Local 100 officers and employees to the union are clearly covered by document requests dating back to May 2000. Nevertheless, the weekly reports for Mr. Diaz and Mr. Hoffman were not produced until November 26, 2001, after their non-production was exposed at Mr. Diaz' deposition. Weekly reports for Dahlia Ward, Michelle Travis and Amanda Ream were not produced until December 5, 2001, and only after we reminded you, once again, of your discovery obligations. *Today you informed me*

form asks for a listing of "current active campaigns" and, as to each, the "# of signed cards." Page two asks for a daily listing of activities, including "campaign planning re:" or "meetings

re:". Any mention of the Union's then-ongoing campaign against the Met would likely have made the document responsive.

*for the first time that Mr. Bitterman and Mr. Granfield filed activity reports with the International Union and that they are "trying" to obtain copies of these reports.* You also stated that you did not know if Mr. Tamarin filed such reports with HER-EIU. Needless to say, defendants should have kept copies of the reports submitted to the International Union as they are clearly responsive to a number of our document requests. Moreover, these reports should have been produced (and subsequently updated) in response to our initial document requests and in response to our subpoena to the International. Finally, at this stage in the game, you should know whether Mr. Tamarin filled out such reports when he was President of Local 100. Please produce these reports immediately. As with the agendas and minutes referenced above, Mr. Tamarin's reports should be produced before his deposition begins.

(Easterly 12/10/01 Letter, Ex. 27 to Lans Decl.).

#### d. Tamarin

Despite this clear request, however, no further production was made, and the Met deposed Tamarin on December 11 without his Weekly Reports and the other documents the Met had requested. (Lans Decl. ¶ 50). At that deposition, the Met asked Tamarin whether he had ever filed Weekly Reports, and he responded affirmatively. (Deposition of Henry Jonathan Tamarin ("Tamarin Dep.") at 25, Ex. 48 to Lans Decl.). When asked what kinds of activities he reported on those forms, he answered, "[w]hether you had meetings, if so what kinds of meetings, organizing campaigns, house visits on organizing campaigns, if any, grievances, . . . negotiations." (*Id.* at 26). The deposition continued:

Q: *Have your counsel in this case asked you to provide them with copies of those reports?*
A: *Yesterday evening.*
Q: Yesterday evening?
A: Yes.
Q: *Have your counsel in this case ever asked you to provide them with your files relating to Restaurant Associates, the*

*Metropolitan Opera, card check neutrality agreements or the like?*

A: *Not prior to yesterday evening.*

\* \* \* \* \* \*

Q: Did you ever provide your files so far as they relate [to] the Met, R.A., the activities at the Met, card check agreements?

A: I believe I was asked last year and provided whatever I had at that time.

Q: Asked by whom?

A: It was either Joe Lynett or Brooks Bitterman.

\* \* \* \* \* \*

Q: You stated last year, so you're talking about some time in 2000?

A: I believe so . . . .

Q: . . . [B]etween last year and last night were you asked for anything?

A: I don't have a recollection.

Q: Last night were you asked for anything other than your weekly reports?

A: No.

(*Id.* at 26–29, emphasis added). Thus, after a month of activity surrounding Weekly Reports, which should have been produced in response to the Met's First Document Request in May of 2000, and after a specific plea by Met counsel the day before Tamarin's deposition for production of his Weekly Reports, not only were they not produced in time for the deposition, but Union counsel did not even ask him for them until the night before his deposition. Such conduct is wholly inconsistent with counsel's obligation to conduct discovery in good faith.

#### (i) Subsidies

Later in the deposition, Tamarin was questioned about a letter of February 28, 2001 that he had written relating to a subsidy to Local 100 from the International, which responded to a letter from the International. He also testified to a written request for a subsidy renewal that he had sent the International. When asked if he had any idea why neither of those had been provided to the Met, he responded, "No." (*Id.* at 64, 65).

It appears that there are other responsive documents relating to subsidies, shown by other discovery to have existed, that have not been produced. (*See* Lans Reply Decl. ¶ 37). In explaining the production of documents from his files, Tamarin stated that he was given a list, which might have been only a verbal list, of files and documents to look for. He did some of it personally and delegated the rest to Bitterman. Tamarin had no record of what he or Bitterman looked at. He did not believe he had looked at any files in his office in Chicago which he had occupied since November 1999 and from which he dealt with the Union's campaign against the Met. *He had no recollection of looking through any files to turn over to his lawyers for possible production from the time he did so in 2000 until the night before his deposition, other than his date books.* He then remembered that he was also asked the night before his deposition about a letter he signed to cultural venues in Chicago. Although this correspondence had taken place close to a year earlier, in January 2001, and included documents defendants created after the commencement of this case and long after the Met's document requests had been served, the Union had produced only a draft and had not looked through Tamarin's Chicago files to see if the finalized letter still existed. When Tamarin was asked if he had copies, he said, "Well, I don't know. We're looking." (Tamarin Dep. at 67–70, Ex. 48 to Lans Decl.).

On December 13, two days after the deposition, Yen sent a letter to Easterly, enclosing Tamarin's letter to the International and stating that she was looking for the other specific documents that had been revealed as never having been produced. (Letter from Yen to Easterly dated December 13, 2001, Ex. F to Yen Decl.).

On December 17, 2001, defendants wrote to the Court requesting an extension of time beyond the December 31, 2001 discovery deadline to take the depositions of certain non-party witnesses who were unavailable in December. (Letter from Yen to the Court dated December 17, 2001, Ex. F to Yen Decl.). In a lengthy letter to the Court dated December 18, 2001, Met counsel stated

that the defendants "*have remained willfully ignorant of their obligations, failed to retain responsive documents, failed to conduct meaningful searches of the documents actually in their possession, and failed to produce wholesale categories of documents*" and outlined the events of the discovery process from May 2000 to that point. (Letter from Easterly to the Court dated December 18, 2001, Ex. 29 to Lans Decl., emphasis added). The Met requested permission to take discovery on the issue of defendants' discovery compliance and to re-depose certain key witnesses whom the Met had deposed earlier without the benefit of the bulk of documents produced after such depositions. The Met further stated:

> Finally, although we cannot at this point determine how much prejudice has been suffered by the Met due to the improper destruction and withholding of critical evidence, *if, upon deposing the people knowledgeable about defendants' document retention, production and lack thereof, we learn that it is necessary, we will move for preclusion or judgment against defendants.* We sincerely believe that defendants' willful failure to comply with their obligations is of the severest nature and may demand that remedy once we learn the full extent of the prejudice thereby imposed on the Met.

(*Id.,* emphasis added.) Yen responded by letter stating that she was prepared to explain *her* review of Local 100's document production. (Letter from Yen to the Court dated December 18, 2001, Ex. F to Yen Decl.).

During a December 18 teleconference with the Court, there was also discussion of the Weekly Reports. Met counsel stated that they still had no Weekly Reports for Tamarin, Granfield or Bitterman. Yen asserted that these reports were maintained for payroll purposes and said the reports did not matter because the employees' calendars showed the same information. Yen also maintained that because these three witnesses' Weekly Reports were submitted to and kept on file at the offices of the International Union, she should not have to obtain them because the International was not a

party. (Lans Decl. ¶ 54). I again ordered that the reports be produced. Defendants still have not fully complied with that order. (*See* Lans Reply Decl. ¶ 32).

#### e. Ream

#### (i) Payroll Department

On December 20, the Met deposed Amanda Ream, a Research Analyst at Local 100 who was hired in September 2000 to work on the campaign against the Met and continues to do so. Ream testified that "to her knowledge" there is no separate "Payroll Department" at Local 100's office. (Deposition of Amanda D. Ream ("Ream Dep.") at 40, Ex. 47 to Lans Decl.). Although it had been represented to Met counsel and to the Court that the Weekly Reports were kept "in the Payroll Department" and that Department was not searched because it was thought it would not have any responsive documents, Ream testified that the "Payroll Department" was a secretary who sat with everyone else in the open office structure. (*Id.* at 38–40). Ream testified that it is a "very small office" and that each staff member simply gives his or her Weekly Report to this secretary, who shows them to Granfield and then puts them in a file cabinet in the open office with all the other files.

Although Ream showed all the files in her area to Bitterman, various materials, which were clearly responsive and quite relevant to the Met's case, had not been produced to the Met. She also testified that drafts of documents created on computers were not saved by Local 100 employees, even those that related to the Met campaign, unless an individual staff member decided, based on his or her own understanding, that a document should be turned over for production to the Met. Even finished documents, computer-generated or otherwise, were not routinely retained. (*Id.* at 34–35, 40). Even those documents that were put into a box for review by Bitterman—for his determination as to whether such documents should be given to the Union's counsel for possible production to the Met—were not necessarily retained on the computer. (*Id.* at 40–43; *see* Lans Decl. ¶ 55). So, if an employee was incorrect as to what was required for production and did not

print out a hard copy of a document, or Bitterman (himself a non-lawyer) decided that it was not responsive, there was no way to retrieve it because the Union had no retention policy. (Ream Dep., Ex. 47 to Lans Decl.).

On December 28, 2001, the Union produced more documents, including a letter that the Met had requested at Tamarin's deposition, and Tamarin's, Granfield's, and Bitterman's reports to the International Union. (Letter from Yen to Easterly dated December 28, 2001, Ex. F to Yen Decl.).

#### 4. Interrogatories Regarding Affirmative Defenses

On January 3, 2002, the Met received the Union's responses to the Met's First Set of Interrogatories, which consisted of five questions. The responses began with three pages of "General Objections." (Ex. 58 to Lans Decl.). The first interrogatory asked defendants to identify expert witnesses defendants intended to call at trial. (*Id.* at 4). In responses signed by Yen, defendants stated that they "are awaiting a substantive response from plaintiff to an earlier interrogatory ... as to the identity of any expert witnesses the plaintiff intends to call.... Pending a timely response from plaintiff to that interrogatory, the defendants have not yet determined whether and whom they will call as an expert witness at trial." (*Id.*). Moreover, defendants stated that they "shall make the disclosures concerning [their] expert(s) at the time and in the manner required by the rules of Court applicable to this action or as otherwise required by the Court." (*Id.*). The Met had served these interrogatories on November 30, which was 30 days before the close of discovery. At that time, trial was scheduled to take place in January. The other four interrogatories sought the basis for four of the affirmative defenses pleaded in defendants' Amended Answer:

2. Set forth the factual basis for the claim in defendants' Answer to the Amended Complaint (Fourth Defense) that "Plaintiff has commenced this action in retaliation against defendants' lawful conduct permitted by Federal labor laws" and

identify any documents supporting this claim.

*Response:* Defendants object to this Interrogatory on the ground that it cannot be answered as framed. Subject to and without waiving the above General Objections, Defendants refer Plaintiff to the Amended Complaint in this action, the Affidavit of James H. Naples in support of motion for injunctive relief, the testimony of Sharon E. Grubin at the preliminary injunction hearing; the deposition transcript and exhibits of Joseph Volpe; information contained in documents bates numbered HF 000001–2347, HF 003365–3974, HF 006944–8329, HF 008899–9144; and knowledge and information possessed by witnesses already deposed in this action and witnesses yet to be deposed in this action.

3. Set forth the factual basis for the claim in defendants' Answer to the Amended Complaint (Fifth Defense) that "[t]he alleged statements of facts made by defendants are true" and identify any documents supporting this claim.

*Response:* Defendants object to this Interrogatory on the ground that it cannot be answered as framed. Subject to and without waiving the above General Objections, Defendants refer Plaintiff to the deposition transcripts and exhibits of Brooks Bitterman, Michelle Travis and Amanda Ream; information contained in documents bates numbered HF 000001–2347; HF 003365–3974, HF 006944–8329, HF 008899–9144; ME 100638–662; the testimony of Bruce Crawford at the preliminary injunction hearing; and knowledge and information possessed by witnesses already deposed in this action and witnesses yet to be deposed in this action.

4. Set forth the factual basis for the claim in defendants' Answer to the Amended Complaint (Ninth Defense) that "Plaintiff's culpable conduct has contributed to any damages it has sustained" and identify any documents supporting this claim.

*Response:* Defendants object to this Interrogatory on the ground that it cannot be answered as framed. Subject to and without waiving the above General Objec-

tions, Defendants refer Plaintiff to information contained in documents bates numbered HF 000001–2347; HF 006944–8329, HF 008899–9144; ME 100638–662; Plaintiff's website, brochures, programs, letters and other publications; and knowledge and information possessed by witnesses already deposed in this action and witnesses yet to be deposed in this action.

5. Set forth the factual basis for the claim in defendants' Answer to the Amended Complaint (Eleventh Defense) that "Plaintiff is estopped from claiming relief for statements that plaintiff makes about itself" and identify and documents supporting this claim.

*Response:* Defendants object to this Interrogatory on the ground that it cannot be answered as framed. Defendants further object to this Interrogatory insofar as it seeks a factual explanation of a principle of law. Subject to and without waiving the above General Objections, Defendants refer Plaintiff to information contained in documents bates numbered HF 000001–2347; HF 006944–8329, HF 008899–9144; ME 199537[sic]–662; Plaintiff's website, brochures, programs, letters and other publications; and knowledge and information possessed by witnesses already deposed in this action and witnesses yet to be deposed in this action.

(*Id.*). Thereafter, Lans communicated with Yen about the insufficiency of the responses, (*see* Letter from Lans to Yen dated January 4, 2002, Ex. 59 to Lans Decl.), but Yen insisted that her answers had been appropriate and never supplied any further information, (Lans Decl. ¶ 56). In response to clear, narrow interrogatories, counsel's wholesale reference to literally hundreds of pages of documents and to "knowledge and information possessed by witnesses already deposed in this action and witnesses yet to be deposed in this action" signals their continuing contempt for the discovery process and their preference for gamesmanship over their obligations as officers of the Court.

5. The Met's Fifth Document Request

The Met's Fifth Document Request was dated November 30, 2001, and a response dated December 30, 2001 was signed by Yen.

### 6. Compliance Discovery

On December 18, 2001, I conducted a lengthy teleconference with counsel wherein I granted the Met's application to serve discovery compliance interrogatories on defendants, who were required to answer promptly, rather than in 30 days; to depose persons with respect to discovery compliance; and to re-examine witnesses on the merits only with respect to topics raised by documents it had obtained after the witnesses had been deposed. (Order dated 12/19/01, Ex. 30 to Lans Decl.; *see also* Orders dated 3/13/02, 3/22/02).

Compliance discovery proceeded initially through interrogatories inquiring into the system the Union and its counsel used in responding to the Met's discovery requests and then proceeded to depositions of individuals at the Union and several of their lawyers who were involved (or, as seemed to be the case with some, not involved) in the discovery process.

On this motion, two Union lawyers submitted declarations in opposition discussing discovery matters: Anderson, who was attorney of record from August of 2000 through the present but who "transitioned out" of the case in July of 2001, (Anderson Decl. ¶ 15), and Yen, who was assigned to the case in mid-October 2001 and remained through compliance discovery in the Spring of 2002.[15]

#### a. Interrogatories

On December 28, 2001, the Met served interrogatories concerning defendants' discovery compliance on the named defendants—Local 100, Tamarin, and Diaz—which were to be answered on January 4. (Lans Decl. ¶ 57). Yen wrote to the Met on January 4 stating that she would be unable to provide any responses that day. (Letter from Yen to Easterly dated January 4, 2002, Ex. 31 to Lans Decl.). On Monday, January 7, counsel attended a conference with the Court at which discovery issues were addressed. Yen participated by telephone. Met counsel asked the Court to direct that interrogatory answers be provided on a date certain. Yen said that she had been working very hard on them but because she had to talk to each of the lawyers who had represented defendants since the case began to find out what occurred with respect to document production, it was taking some time. Met counsel pointed out that Herrick Feinstein had represented the Union in the case from its inception, so it was difficult to understand why Yen was only then piecing together information from her colleagues' memories in order to answer that a complete document search had been made. I agreed, noting that Yen's review of the correspondence file should have provided the information she needed and stated: "If it didn't, then, you know, we have a greater cause for concern than that these folks have to search their memories at this point." (Transcript of 1/7/02 Conference at 12, Ex. 32 to Lans Decl.). I also ordered defendants to provide the interrogatory responses by January 9. (*Id.* at 14). Compliance discovery has confirmed that there is indeed more to worry about.

On January 9, Yen wrote to the Court saying it was not possible for her to respond that day and requesting an extension to Monday, January 14. (Letter from Yen to the Court dated January 9, 2002 ("Yen 1/9/02 Letter"), Ex. 33 to Lans Decl.). Yen stated that she had requested consent from Met counsel, who had refused. (*Id.* at 1). Yen stated, "In light of the Court's explicit direction to me during the January 7 conference to provide 'a serious response on behalf of defendants' (Tr. at 36), I cannot in good faith submit by the end of business today Answers to Interrogatories signed by me before I have had the chance to exhaust my interviews and investigation." (Yen 1/9/02 Letter at 2, Ex. 33 to Lans Decl.). Met counsel assert that they received Yen's letter by fax at 7 p.m. (Lans Decl. ¶ 57). That

---

15. Lynett, who represented the Union from the outset through the PI Hearing, did not submit an opposing declaration, but his deposition was taken in the course of compliance discovery. As is noted below, Moss also did not submit an opposing declaration.

Jamain Sewell, an in-house attorney at Local 100, also submitted a declaration, but it was directed to proceedings before the NLRB. Sewell did not represent the Union in any phase of the litigation. (Declaration of Jamain Sewell dated April 29, 2002 ¶ 3).

night, Easterly sent a letter to the Court in response, stating:

> Defendants have had ample time to gather the information needed to respond to these Interrogatories—which simply ask the defendants to outline what they did to search for and produce documents responsive to each of the Met's five sets of document requests. Indeed, *given defense counsel's repeated assurances to the Met over the past six months that defendants were in full compliance with their obligations, it should not be necessary at this late date to gather any information at all. They are merely being asked to set forth what they have already done.*
>
> *If, however, Ms. Yen is saying that she must (only now that she is obligated to sign her name to a legal document, see Yen Ltr at 2) determine whether her law firm complied with its discovery obligations, then her letter proves what the Met has always feared—that counsel for defendants has failed to provide adequate supervision, instruction and guidance to defendants in the discovery phase of this lawsuit, resulting in what we have continuously maintained is an inadequate and faulty production.*
>
> \* \* \* \* \* \*
>
> The Met has already been prejudiced in having to take depositions and plan its case based on incomplete information. Every additional day that defendants withhold information further prejudices the Met in our efforts to prepare for trial within the Court's schedule. Accordingly, we respectfully request that Your Honor order defendants to submit immediately their responses to these Interrogatories and provide the other information due so that the Met can move on.

(Letter from Easterly to the Court dated January 9, 2002, Ex. 34 to Lans Decl., emphasis added). The Met received the interrogatory responses on Monday, January 14.[16]

At the January 7 conference, Met counsel raised other problems with defendants' discovery, and I made certain rulings. (Tran-

script of 1/7/02 Conference ("1/7/02 Tr."), Ex. 32 to Lans Decl.). With regard to the production of Weekly Reports, Met counsel explained that although some had recently been produced, production was not complete, pointing out, as an example, that no reports for Bitterman had been produced. (*Id.* at 19). Yen repeated that defendants had not "realized" that "anything in the payroll or expense department was called for," (*id.* at 19–20), despite my having rejected that explanation before and having ordered production. Moreover, at that conference, Yen stated that Bitterman did not generate any Weekly Reports, which was contrary to what the Court and Met counsel had been told by Union counsel orally and in writing. (*Id.* at 19). Yen explained:

> ... a box arrived from the international union containing Mr. Tamarin's, Mr. Granfield's, Mr. Bitterman's for a three year period of their weekly reports and expense reports or, you know, whatever they had. I have no reason to doubt they have given me everything.
>
> THE COURT: If it is now the defendants' position that there are no more, then you better put in a response to that effect and then we are finished with it. But now plaintiffs are sitting here telling me they don't have them.
>
> MS. LANS: And I'm actually not clear whether Ms. Yen has had a chance asking [sic] the International whether there are any reports. . . .
>
> THE COURT: How are we going to find out the answer to this question?
>
> MS. YEN: I can make one last inquiry of the people at the International who would know and then ascertain that everything they gave me is everything that is in their possession relating to weekly reports or expense reports of all these individuals.
>
> MS. GRUBIN: Which individuals?
>
> THE COURT: I actually do recall the discussion of Mr. Bitterman's reports having been sent to Chicago. I don't, as I sit here, remember what the instructions are

---

**16.** Yen's difficulty in responding to an interrogatory essentially inquiring as to the system established by the Union and its counsel to respond to

the Met's requests for documents foreshadowed the conclusion I reach today that there was *no* system.

in the document requests, but at least get out a response so that if plaintiffs are going to take some more steps they can do it promptly. All right?

(*Id.* at 20–21).

Further, Met counsel expressed their concern that a thorough search of the Union had not been conducted, specifically with respect to the Weekly Reports:

MS. GRUBIN: ... I don't want it focused on the specific individuals. We are entitled to weekly reports of anybody at this union who had anything to do with this, and now we—

THE COURT: By "this," of course, you mean the campaign?

MS. GRUBIN: The campaign against the Met. Yes.

THE COURT: Whatever the document request says it says. If that's what it says, then that's what you are entitled to.

MS. GRUBIN: The document request says all the documents.

THE COURT: Ms. Yen is going to put a response in.

MS. GRUBIN: No. But the document request asks for all documents relating to the Met and the campaign against the Met. That's one document request.

The problem is we found out that these weekly reports existed during one of the depositions that we took.

THE COURT: I remember all this.

MS. GRUBIN: So now we are focused on that. But my problem is when we say what else hasn't been produced, we only know what we found out what hasn't been produced, and from what I'm hearing from Ms. Yen's answer as to whom she has to talk to, as to what kind of search was made and—

\*　　\*　　\*　　\*　　\*　　\*

MS. LANS: I think the weekly reports are an example of the problem we are having.

We sent off a letter on Friday that related to document requests and interrogatory answers and the inadequacies of those. We sent a letter this morning with respect to other document issues. I think

the point here is, we will, I believe, want to redepose some witnesses.

THE COURT: But that is not today's problem.

MS. LANS: But I think we first need to get to the bottom of complete discovery, paper discovery, I think.

THE COURT: Absolutely. And I don't think anybody is objecting. We are going to get the answers to the interrogatories the end of the day the 9th. It sounds like we ought to get the Rule 34 response at the same time, if not before that.

(*Id.* at 21–23).

### (i) Subsidies

The conversation then turned to the Met's specific document request concerning subsidies received by Local 100 from the International:

MS. EASTERLY: We received partial documents.

*For example, we received a letter,* I believe, it was *dated February 28 from Mr. Tamarin, the former president—*

THE COURT: February 28?

MS. EASTERLY: *Of 2001, from Mr. Tamarin to John Wilhelm, who is the president of the International union. In that letter Mr. Tamarin refers to correspondence from Mr. Wilhelm from earlier in the month. So we said, well, we want that letter, too, please produce that letter. We got that letter. That letter refers to an earlier letter in January from Mr. Tamarin.*

We feel we are being nickel and dimed. We would like the defendants to produce all correspondence, all documents that relate to the subsidy that they are receiving. Notably, we have not received any correspondence concerning the subsidy of the year 2000, yet the Form 990s of the union shows there was a subsidy.

THE COURT: Ms. Yen, what do you say?

MS. YEN: *I don't know why they need the subsidy number of the International to Local 100.* What has that to do with defamation or in the Lanham Act?

THE COURT: Is this in the nature of an objection to the request?

MS. YEN: Yes. I think at this point I would object given—

THE COURT: But it is too late now.

MS. YEN: Not under my watch. But documents have been produced and I think now they are getting very far afield in wanting more and more documents on this particular subject, which I don't find has anything to do with what they have to prove at trial.

THE COURT: But the request was out there for some time now apparently unobjected to. Am I wrong?

(1/7/02 Tr. at 24–25, Ex. 32 to Lans Decl.). At that point Moss interjected:

MR. MOSS: No, no. *This is the interpretation of a blunderbuss request for all documents relevant. This is now the plaintiffs' [sic] refinement of that request as they go along and they say now we want this and we want that and we want the other thing.*

THE COURT: What was the request?

MS. EASTERLY: The request was for all documents—I can get it for you specifically. But I object to the characterization that it is a refinement of the request. When you have receive[d] one piece of correspondence that clearly responds to the request and that references a prior piece of correspondence that it is responding to, one would think that the whole part and parcel, the whole parcel of correspondence is responsive to the request. But let me find it for you.

MS. GRUBIN: There was a specific request. Ms. Moss [sic] before you read it, what was the date of the request?

MS. EASTERLY: This is dated October 23.

*We asked for all documents or communications concerning HEREIU's subsidy, reimbursement or other financial support of Local 100's organizing activities, staff and/or operating or administrative expenses.*

THE COURT: *It doesn't sound blunderbuss to me.* Produce them by the 10th.

(*Id.* at 25–26). Yen's and Moss' responses in this interchange were typical of their approach to discovery in this action. At a conference where Met counsel raised a discovery item previously discussed with Yen and Moss, as to which no response had theretofore been received, Yen manufactured an objection on the spot. When that was rejected as being too late, Moss objected (clearly without stopping and thinking about the legitimacy of his objection) that the request was a "refinement" of a "blunderbuss request," only to be directed to the specific narrow request seeking precisely the documents under discussion. Piecemeal production (or in the words of Met counsel, "nickel and diming"), obstruction and delay remained the order of the day. Union counsel also continued their tactic of responding to the Met's fortuitous identification of a particular document rather than assuring that a complete search for all responsive documents had been conducted.

#### (ii) Benefits

The other specific document request discussed at that conference was one for documents concerning benefits paid to Union workers, which, as noted above, had been the subject of the Met's Third Document Request to which defendants' Rule 34 Response, signed by Moss, stated, "there are no responsive documents." (Ex. 9 to Lans Decl.). As also noted above, however, defendants' witnesses and documents showed that could not be the case. After a lengthy discussion, in which Yen related what she had been told by Union officers as to the nonexistence of such documents, the following transpired:

MS. GRUBIN: Maybe I'm off the mark, but isn't it counsel's responsibility to do the search and then tell us there aren't any documents, rather than say, well, Mr. Granfield testified that they are not in writing?

\*　\*　\*　\*　\*　\*

THE COURT: Ms. Yen, the question is, is that a response on behalf of defendants and officers and the like, or is that a response from Mr. Tamarin?

If the answer on behalf of defendants is no such documents, then I don't know why

we are discussing it. But it doesn't sound like the inquiry has been made.

MS. YEN: I can make one last inquiry of everyone in the office.

I mean, we asked the people who are in the know—

THE COURT: Okay. But there has to be a response made in a proper Rule 34 manner. Let's do it. Same thing. January 9. Next.

MS. EASTERLY: . . . I would just like to say, we would like the court to direct the defendants to make a union wide search by attorneys of the documents that are in defendants possession. *And that seems to be sort of the root of the problem here, is that the lawyers involved have not conducted the search, they have relied on representations by lay people and that's part of why we have been receiving documents piecemeal.*

THE COURT: I thought that that's what we are doing with the follow-up depositions now, the interrogatories and the like.

MS. GRUBIN: Yes.

MS. EASTERLY: I think we are getting more information about what occurred in the past, but I think prospectively, I guess we can wait for that response.

THE COURT: I think Ms. Yen has the point here.

Ms. Yen, I said I think you have the point. Yes?

MS. YEN: Yes. . . .

(*Id.* at 34–36, emphasis added).

As discussed above, Yen did not timely complete the interrogatories. In addition, the Met did not receive any of the documents ordered to be produced on January 9 or 10. (Lans Decl. ¶ 60). With respect to the Rule 34 Responses, the Met received by fax at 9 p.m. on January 10 a letter from Yen, in which she responded to specific questions that had been asked in the Met's prior correspondence, and then stated:

Additionally, this serves as a Rule 34 response that (1) there are no weekly reports for Brooks Bitterman at either the International Union or at Local 100 and all expense reports submitted by Mr. Bitterman to the International Union for the period requested have been produced; (2) as to Request 28, I have personally questioned Mr. Tamarin, Mr. Granfield and each employee of Local 100 who may have knowledge, and I have reviewed Mr. Granfield's file, and I am satisfied that there are no documents in defendants' possession reflecting "communications with its members or internally among its employees about these benefits plans" or "documents that might show that Local 100 members have complained that they don't get their benefits." (January 7, 2002 hearing transcript at 30–31.)

(Letter from Yen to Lans dated January 10, 2002, Ex. 35 to Lans Decl.). Thus, the Rule 34 Responses were limited to only the Weekly Reports of Bitterman (previously represented by Yen to have been sent to Chicago to the International) and not those of other Union employees. On January 11, Yen sent a letter enclosing what she said were all documents responsive to the Met's Request concerning subsidies from the International which had not previously been produced. (Letter from Yen to Easterly dated January 11, 2002, Ex. 36 to Lans Decl.). She also provided a day planner kept by organizer Dahlia Ward, explaining that although she had previously questioned all Local 100 employees and thought that Ms. Ward had informed her she had no day planner, she learned upon questioning employees on January 10 that she did have one. (*Id.*).

Attached as Exhibit 37 to the Lans Declaration are three letters of January 14 written by Easterly. In the two written to Yen, Easterly questioned Yen about her January 10 letter. With respect to the Weekly Reports, Easterly wrote:

We understand your response to mean that Mr. Bitterman did fill out weekly reports (as did all the other officers and employees of Local 100), but that these reports simply cannot be found at either the offices of the International Union and Local 100. Please clarify: whether Mr. Bitterman filled out weekly reports, and, if so, where these reports were filed and what efforts have been undertaken to locate them. Also, please clarify whether, aside from Mr. Bitterman, you have pro-

duced all the weekly reports for all the union employees or officials who worked on the campaign against the Met.

(Second letter from Easterly to Yen dated January 14, 2002, Ex. 37 to Lans Decl.). To date, the Met has never received a response from defendants as to whether all Weekly Reports which reflect work on the campaign against the Met have been produced by Union officials and employees. (Lans Decl. ¶ 62).

Easterly also pointed out to Yen that her representation that she had produced all subsidy documents appeared incorrect, specifying to Yen what was still missing. (First letter from Easterly to Yen dated January 14, 2002, Ex. 37 to Lans Decl.). Easterly's third letter was sent to the International regarding its "patently incomplete" production concerning subsidies and other requested documents.[17] (Letter from Easterly to Richardson dated January 14, 2002, Ex. 37 to Lans Decl.).

On January 15, Easterly again wrote to Yen:

Finally, we note that we are still waiting to receive from you a number of documents as well as responses to discovery challenges. Your attempt to dismiss as "peripheral" documents still withheld by defendants is disingenuous. But more importantly, *your* assessment of their importance is irrelevant and immaterial given that the Court ordered you to produce specific categories of documents by dates certain last week and ordered you to produce *all* documents responsive to the Met's document requests by last Thursday, January 10.

(Letter from Easterly to Yen dated January 15, 2002, Ex. 39 to Lans Decl.).

In a letter of January 18, Easterly gave Yen a compilation of numerous (although not all), long-standing discovery items on which defendants were still in default. (Letter from Easterly to Yen dated January 18, 2002, Ex. 40 to Lans Decl.). Among the items addressed were that Weekly Reports had

still not been produced and no Response provided as to their existence; that Weekly Reports that clearly did exist had not been produced; that Bitterman's expense reports had been produced only for scattered dates and that no expense reports from other Union personnel had been produced for July 2001 to the present; that the representation concerning the completeness of Peter Ward's documents was patently incorrect; and that the Met was still awaiting a response as to why the documents concerning subsidies from the International outlined in Ms. Easterly's January 14 letter had still not been produced. (*Id.*). Yen never responded. (Lans Decl. ¶ 66).

Met counsel sent additional letters during February and March seeking other long-requested items, among them those that defendants had agreed to provide during depositions of their witnesses but had never provided. In a response confirming defendants' clear purpose of delay and obfuscation, Yen responded to most of these letters that discovery had "closed" on December 31. (*See, e.g.,* Letters from Yen to Easterly dated February 12, 2002 and April 2, 2002, Ex. 41 to Lans Decl.).

On March 26 and 28 and April 1, the Met sent additional letters (included in Ex. 41 to the Lans Declaration) to Yen concerning various items, including the numerous Weekly Reports that have still not been produced. On April 2, Yen sent her response, ignoring all but two specific inquiries—one concerning a transcript and the other concerning the Union's privileged documents. (Letter from Yen to Easterly dated April 2, 2002, Ex. 41 to Lans Decl.) She also stated: *"I have earlier stated to you in writing that discovery has been closed for some time and we will not respond to new demands."* (*Id.*, emphasis added).

### b. Depositions

In March of 2002, the Met took depositions relating to the defendants' discovery compliance and went for a "walk-through" of Local

---

**17.** The Met had earlier served a subpoena on the International and had written to the International directly because, although Herrick Feinstein were the attorneys who responded to the subpoe-na, Herrick Feinstein attorneys maintained on various occasions that they did not represent the International.

100's office.[18] The Met deposed Bitterman, Granfield, Lynett, Rimmelin and Yen on the subject of discovery compliance. (Exs. 42–46 to Lans Decl.). All witnesses agree there was no filing system at Local 100 and no policy or practice as to how files should be kept. Rather, each person just kept (or did not keep) his or her own files. It is also agreed that there has never been any policy or practice regarding retention or destruction of documents. Lynett was the attorney on the case for defendants at its commencement. As related above, in May 2000, he falsely represented to the Court that all documents responsive to the Met's First Request had been produced.

### (i) Granfield

Granfield testified that he remembered a conversation when this action was commenced with Lynett (who was Local 100's in-house lawyer at the time) in which Lynett told him about the lawsuit and said defendants were required to turn over some documents. He said Lynett showed him a "list" (which was a copy of the Met's First Document Request) and told him he should look through his own files. (Granfield Dep. at 382–83, 388, Ex. 43 to Lans Decl.). He does not remember Lynett's telling him anything beyond that. He was not provided with copies of any of the Met's other Document Requests in this action. (*Id.* at 386, 390, 403). He told Lynett that Bitterman, Diaz and Dahlia Ward might also have relevant documents because they worked on the Met campaign. (*Id.* at 388–89). Granfield then looked through his "Met Opera organizing file" and nothing else. (*Id.* at 389–90). Lynett did not discuss with him what a "document" was. He does not recall Lynett's ever telling him that e-mails, for example, or drafts of documents were required. He does not recall whether Lynett talked to him about non-identical copies of a document being required or of any discussion of calendars or day planners. He did not have any conversation with Lynett about what any of the document requests meant or what the scope

was of the documents encompassed by the requests. (*Id.* at 391–92). He gave his "organizing file" to Lynett, which was the only thing he did with respect to document production in this case until over a year later in July 2001. (*Id.* at 392–93).

Granfield does not recall Lynett's telling him to look for documents saved on computers or to save documents relating to the Met on his computer. (Granfield Dep. at 405–06, Ex. 43 to Lans Decl.). In fact, he did not check any computers for documents until much later. When Granfield did search computers, he searched two of the three computers that were maintained in Local 100's "shared" computer room. (There is no network at Local 100, so there is no access by one computer to documents on another computer.) The shared computers were those that Granfield used, which were also used by other people, including the researchers and organizers, although many people in the office did have their own computers. When Granfield searched the two computers, he did so by looking only at the titles of documents in the computer's "My Documents" folder or its hard drive; he did not remember which. What he looked for were document titles "that would say Met Opera." (*Id.* at 410). Although he knows how to use the computer's "Find" tool, he did not do so. He only looked at the names the documents had been given on the drive. He does not remember if he found any documents for production as a result of this "search." He explained, however, that he himself does not save any documents on the computer. Whatever documents he wants to save he has always put on a diskette. Sometimes he saves some hard copies. The types of documents he puts on his diskette are card check neutrality agreements, leaflet drafts and occasionally letters. He only maintains one diskette—when it is full, he simply deletes items and saves the new ones on it. (*Id.* at 530–35). He has no record of every item that has been deleted from his diskette. (*Id.* at 535). He has

---

**18.** The Union had initially objected to a walk-through, and, in an effort to avoid it, Yen produced a floor plan of the Union's offices. (Response to Int. No. 8, Ex. 53 to Lans Decl. at 1). She argued that production of the floor plan obviated the need for a walk-through. In light of that argument, it was astounding to learn, in subsequent depositions, that the floor plan was admitted to be inaccurate. (*Id.* at 2; *see also* Lans Reply Decl. ¶ 84).

never provided his diskette to any of the Union's counsel. (*Id.* at 405). He never told Yen that he deleted items from his diskette, and she has never asked. (*Id.* at 534).

Granfield had no conversations with Anderson concerning discovery. He has never talked to Jamin Sewell (Lynett's replacement as the Union's in-house counsel as of mid-June 2000) generally about retention of documents or discovery obligations (although they did discuss the fact of new document requests). He does not recall any conversations with Darlene Fairman (Yen's predecessor on the case at Herrick Feinstein) about discovery. The first time he spoke to either Moss or Yen about discovery was when he was prepared for his deposition in October 2001. (Granfield Dep. at 413–416, Ex. 43 to Lans Decl.). When Yen went to the Local 100 office on January 10 (to interview people to answer the Met's compliance interrogatories), he provided his files to her. *January 10, 2002—after the close of discovery—was the first time since May of 2000 that any lawyer had come to the Local 100 office to look at the contents of Granfield's file cabinets.*[19]

Granfield had put Bitterman in charge of document production. (*Id.* at 420). He is not aware of any request ever being made by Bitterman or by any of the lawyers to any of the staff in writing concerning document discovery. Finally, when asked at the end of his deposition if he would articulate what documents responsive to the Met's requests are, he stated—after a speaking objection by Yen on the basis that there are over 69 separate requests—that they are "[d]ocuments that talk about the Met or are used in relationship to the Met R.A. campaign." (*Id.* at 536–37).

At this deposition on March 25, it was learned that the three computers the Met had seen in the shared computer room at the time of the Met's walk-through on March 15 were brand new. When asked when the three computers that had been there for

several years were replaced with these new ones, Granfield said, "About two weeks ago." (*Id.* at 408). Perhaps coincidentally, perhaps not, it was two weeks earlier, on March 11, in a teleconference, that Met counsel asked for permission to have a forensic computer expert examine defendants' computers. Granfield did indicate that the old computers are still around Local 100's office.[20] (Granfield Dep. at 408–09, Ex. 43 to Lans Decl.). In response to the Met's present motion, Rimmelin explained that the new computers had been ordered prior to the Met's mention of a forensic computer expert. (Affidavit of Margaret Rimmelin dated May 1, 2001 ¶ 6, attached to Yen Decl.). Even accepting that statement as true, for the Union and its counsel to permit the computers in use during the relevant period to be dismantled without notice to Met counsel in the face of a year of protest by Met counsel that electronic documents had not been retained or produced, court orders to preserve and retrieve electronic documents and the Met's announcement that it might engage a forensic computer expert is a willful disregard of their discovery obligations.

### (ii) Bitterman

Bitterman confirmed at his deposition that he was the person generally in charge of assuring defendants' compliance with discovery obligations. However, he could not remember what he had done specifically in making his search or when. Bitterman spoke to Anderson, (Bitterman Dep. at 424–25, Ex. 42 to Lans Decl.), and Lynett, (*id.* at 426–27), but cannot recall what they said. He said he asked those people whom he thought would have responsive documents to give him whatever they had. He did not remember how he described what the documents were that should be provided. Bitterman knew of the existence of Weekly Reports at least since the inception of this action. (*Id.* at 386). He did not always check each individual's files himself; rather, he sometimes left it up to the individual to do

---

**19.** Lynett looked at files Granfield had assembled for him. (*Id.* at 386–388, 392).

**20.** The Met explored retention of such an expert, but (apart from the significant cost thereof) was

told that because of the time period involved and the manner of Local 100's usage of computers, the likelihood that material could be retrieved was not high. (Lans Decl. ¶ 75 n. 28).

his or her own search. He does not recall what he did to search for e-mails, (*id.* at 355–56, 363, 442–43), and he personally searched only his own laptop and the computer that was located closest to him, (*id.* at 349). He spoke to people about the document requests but he did not recall ever giving anyone copies of the Met's requests. (*Id.* at 418–19). He never put any instructions in writing to others as to what was required, and he never received any written instructions from defendants' counsel as to what he was supposed to do. He created no checklist, and there is no other document from which one could ascertain the steps he took to assure compliance with discovery requests. (*Id.* at 441–42). The only thing in writing he obtained from counsel was one (or perhaps two) letters that Anderson had written to Stillman after the July 18, 2001 conference with the Court. (*See, e.g.,* Bitterman Dep. at 348–49, 355–57, 363, 375–76, 383–88, 419, 420–429, 441–42, Ex. 42 to Lans Decl.).

(aa) The Union's Storage Facility

At the Met's walk-through on March 15, there were several boxes against a wall that, it turned out, were being sent to Local 100's storage facility. (Lans Decl. ¶ 80). The deposition testimony of Local 100's office manager, Margaret Rimmelin, (Ex. 45 to Lans Decl.), and of Lynett, (Ex. 44 to Lans Decl.), reveals that every year to year-and-a-half there is a weekend in which files in the office are reviewed. Some are thrown away, and others are sent to storage because the office is too small to keep them all. No one has ever looked in the storage facility, which is in Brooklyn, in connection with document production in this case. Although Rimmelin has an inventory of what is in storage, she has no recollection of a lawyer's or Bitterman's ever asking to look at it. (Rimmelin Dep. at 45, Ex. 45 to Lans Decl.).

(iii) Rimmelin

Rimmelin has been at Local 100 since its inception in 1983. Mary Myhre works under Rimmelin. Myhre keeps the office's contract files, posts dues, keeps the Weekly Reports file and types letters. The letters she types on her computer are whatever is placed in her "basket" by organizers or others at the office. Myhre also "purges" files as needed, (*id.* at 8–9, 18), and keeps a file of Weekly Reports, (*id.* at 12, 15–16).

Rimmelin maintains files on membership meetings, including sign-in sheets which she gets from Granfield. (*Id.* at 22). She is in charge of documents that are sent to storage and keeps an inventory of what is in storage, although she currently still has in the office about the last two years of documents. (*Id.* at 19–21). The individual organizers keep their own files and do not send them to storage through Rimmelin. (Rimmelin Dep. at 17–18, Ex. 45 to Lans Decl.). As noted above, she does not recall any lawyers' having asked to see the inventory of documents in storage or of Bitterman's having done so. (*Id.* at 45). She and Granfield put together the draft budget for last year. Her computer has Internet access and e-mail.

Rimmelin was involved in document production in this case on two occasions. The first was in January 2002—after the close of discovery—when she was asked to provide telephone records,[21] and the other was about a "month ago," (*i.e.,* February of 2002), when she was asked to provide the Union's by-laws, its documents relating to its subsidy for the Met campaign from the International and certain other financial records.[22] The only attorney she has ever spoken to about document production in this case is Yen, who called her once on the phone at the end of 2001 or beginning of 2002 about some specific documents and then came to the office on January 10, 2002. (*See id.* at 48–49, 54–55). Yen had not looked at her files prior to January 10, 2002. (*Id.*). Rimmelin has never had a conversation with Bitterman or Granfield about keeping documents or document retention for purposes of this case, although she knows Bitterman had a basket someplace where people were putting copies of documents for the case. (*Id.* at 43–44). She has no understanding of what documents

---

**21.** I ordered these to be produced in July 2001.

**22.** These were all documents requested by the Met's Fourth Document Request, served October 23, 2001.

are supposed to go into that basket and has never put any there herself. (*Id.*).

### (iv) Lynett

Lynett's only responsibility for document discovery in this case was with respect to the Met's First Document Request in May 2000. Already discussed above are the few steps he took to comply. As he had told the Court in May 2000 and as he stated in his deposition, after producing the documents to the Met on May 23, the night before the PI Hearing, he never went back to Local 100's office to confirm that a full search had been made because he was satisfied that what had been produced on May 23 was complete. (Lynett Dep. at 50, Ex. 44 to Lans Decl.). As is clear from, *inter alia*, the testimony of the Union employees noted above, there was no basis for Lynett's belief. Lynett was also asked about the storage facility:

Q: Are you aware that Local 100 has a storage facility of some kind?

A: I think they have one.

Q: Have you ever been there?

A: God, no. I think I'd remember it. Having been to storage facilities are memorable events. Now that you mention it I think they do.

Q: Do you have any idea what's in the storage facility?

A: I imagine a lot of paper.

Q: Right. Do you have any knowledge of who is responsible for the maintenance of the storage facility?

A: I don't know if anybody would be.

Q: Do you know if there's an inventory of what's in storage?

A: I have no idea.

(*Id.* at 50–51).

### (v) Yen

In her deposition, Yen said she had been to Local 100's office three (maybe four) times. She went for the first time in November 2001, just to look it over and meet some of the staff. The next time was on January 10, 2002—after the close of discovery—when she

went there to be able to respond to the Met's discovery compliance interrogatories by reviewing with employees what they had produced. The only additional time she remembers was on March 15 when she accompanied Met counsel on the walk-through. (Yen Dep. at 5–8, Ex. 46 to Lans Decl.). Aside from providing the document request, Yen has never given written instructions to anyone at Local 100 concerning their obligations with respect to document retention or production. (*Id.* at 122).

As noted above, when Yen finally agreed to produce the Weekly Reports, she decided (but did not inform Met counsel) that she would produce them only for those people for whom the Met had requested day planners and calendars: Diaz, Tamarin, Bitterman, Granfield and Hoffman. (*Id.* at 47). In addition, she decided that because Tamarin, Granfield, and Bitterman were paid directly by the International and all their reports were sent by them to the International's offices, she would not obtain the reports because the International was a "non-party." (*Id.* at 50). It was only after the Court ordered her to do so that she obtained those reports.[23] Yen acknowledged that she had not known of the existence of "Weekly Reports" until the Diaz deposition but she took no steps to produce them even then because she did not think they were relevant to any document request except, perhaps, the one requesting calendars, day planners and so forth. Yen testified:

Q: Now, when you first learned about the weekly reports did you go back and review the various document requests that had been made in the case to see whether the reports were encompassed by any of those requests?

A: Yes.

Q: It was your view that there was no request except possibly the request for calendar and related material which encompassed the weekly reports?

A: That's right.

---

**23.** The Met received Tamarin's and Granfield's Weekly Reports on December 28, three days before the close of discovery. There were signifi-

cant gaps even in that production. (*See* Ex. 41 to Lans Decl.).

Q: So, for example, *it was your view that request Number 19 ... which is promulgated as part of our second request which were dated May 25th, 2001 which reads all documents and communications concerning any past or future leafletting, [sic] publicity or other scheduled activity directed in whole or in part to the Met,* potential donors to or patrons of the Met including without limitation any public or private gathering, meeting, demonstration, rally, protest or any communication in a public or private place concerning the Met that that request, for example, *did not encompass the weekly reports?*

A: I don't recall now, but at the time I may have looked to see if we objected to the scope of this particular request or to the broadness or vagueness or over inclusiveness of this request. But yes, *I still believe that weekly reports done so that they can collect their paychecks would not be in the contemplation of this document request.*

(Yen Dep. at 57–59, Ex. 46 to Lans Decl., emphasis added).[24]

Despite Met counsel's constant clamoring for a complete file search supervised by an attorney, Yen never made a search of any files at Local 100 prior to January 10, 2002 during compliance discovery. On January 10, she spent about seven hours at the office, approximately three of which she spent looking at certain files, although she did not actually review the documents contained in most of them, except for files in Diaz's office. She sat at one of the fourteen computers and asked Dahlia Ward to pull up the list of her e-mails. (That computer has since been replaced by Local 100 with a new one.) (*Id.* at 80–81). Yen found two e-mails that had not been produced and provided them to the Met the following day but she did not look at anyone else's e-mails and at no other time did she look at the contents of any Local 100 computer. She has never asked anyone at Local 100 which ISPs they used and she does not recall if she asked anyone about having computers at home that they used for work. (*Id.* at 81–83, 102). She is not aware of any other lawyer for defendants having looked at

the contents or an inventory of any Local 100 computer. (*Id.* at 127).

Yen was then asked about records of "house visits" in connection with the Met campaign. (*Id.* at 110–11). House visits are trips made by Union personnel to the homes of RA workers. Reports of visits by Union personnel to RA workers in connection with the Union's campaign to organize workers at the Met would be responsive to, *inter alia,* Request No. 1 in Plaintiff's First Document Request, *viz.,* communications concerning communications concerning the Met. (Ex. 1 to Lans Decl.). The Weekly Reports indicate that Union personnel made many house visits to the individual RA workers to solicit their support for the Union. However, the only report or notes of the results of any of those visits produced by defendants are two pages from one day in 1998 and some scribbled notes. The 1998 records were made on a form entitled "Housecalling Sheets." (Ex. 51 to Lans Decl.). Referring to a Weekly Report of Dahlia Ward for the week ending January 29, 2000, (Ex. 52 to Lane Decl.), Lans asked Yen:

Q: ... on the Wednesday of that particular week Ms. Ward makes an entry which says calling Met, and there's a word that I can't read. Then it says and filling out house ... and something is cut off and then it says house visit report sheets.

Do you see that?

A: I see it, but I'm trying to determine what it says.

Q: Well, you see the reference to house visit report sheets?

A: Yes.

Q: And to filling them out?

A: Yes.

Q: Have you ever asked Ms. Ward or anyone else at Local 100 about house visit reports or report sheets that they maintain concerning visits to Met workers?

A: I've never asked them about, quote, unquote, house visit report sheets, but I've had conversations with the organizers about materials or notes, if any, in connection with house visits.

---

**24.** *See supra* note 13.

Q: When you say the organizers, are you referring among others to Mr. Diaz and Ms. Ward?

A: That's right.

Q: Has either Mr. Diaz or Ms. Ward or any other organizer told you that they have completed from time to time any sort of a form whether they've called it a house visit report sheet or not concerning their visits?

A: No.

Q: Did you ask them whether they completed any sort of form or kept any sort of record of their house visits?

A: Not in that way. I would say do you bring anything on your house visits and the answer was no. Do you take notes? The answer was no. I'm not sure if I asked him specifically do you keep reports as such.

 \* \* \* \* \* \*

Q: So, in any event, insofar as your conversations with the organizers including Mr. Diaz and Ms. Ward, were you left with the impression from what they told you that they did not keep any form of written record of who they visited, when they visited and what occurred on a visit?

A: Yes.

(Yen Dep. at 109–111, 112, Ex. 46 to Lans Decl.). Then, referring to the two pages of the 1998 "Housecalling Sheets," (Ex. 51 to Lans Decl.), Lans asked:

Q: Have you ever brought either of the two documents that I've given you as Exhibit 7 to the attention of Ms. Ward or Mr. Diaz and asked them what they are?

A: No.

Q: Have you ever had any conversation with either of them or any other organizer of Local 100 about what those documents are, what type of documents they are?

A: No.

Q: Did you see any documents like Exhibit 7 when you were looking for Mr. Diaz's files?

A: No.

Q: Ms. Ward's files?

A: No.

THE WITNESS: I want to note for the record that these documents were produced by Local 100 at the inception of the litigation. That probably goes back to August of 2001.

(Yen Dep. at 115–16, Ex. 46 to Lans Decl.). Yen's comment typifies the lawyers' attitude toward discovery in this case; instead of shouldering the responsibility imposed by the Rules to conduct a good faith search for responsive materials—which would have yielded the obviously-responsive Housecalling Sheets—defense counsel seeks to impose on Met counsel the burden of identifying with specificity documents in the Union's files that are responsive and have not been produced. The Union's lawyers have it seriously backwards.

Yen has never been to the Local 100 storage facility and does not know what is stored there. She has never looked at an index or inventory of the items. In fact, Yen did not even know the Union had a storage facility until the Met's walk-through when Met counsel asked about certain boxes in the office:

Q: Do you remember when it was that you talked to Ms. Rimmelin about materials that were being sent to storage?

A: I think it was on the date of the inspection.

Q: Okay. That's last Friday [March 15, 2002]?

A: Yeah.

(*Id.* at 92).

Yen never gave either of Tamarin's secretaries (in New York or Chicago) copies of the document requests for review, even though Mr. Tamarin types none of his own letters. (*Id.* at 106). She never spoke to or reviewed files of organizers who had participated in rallies, leafleting and RA team meetings, such as (but not limited to) Robert Demand, Gilbert Palacios, Cliff Fried, Juan Galan and Miguel De La Rosa. (*Id.* at 37). As noted earlier, when—just after the depositions—the Met attempted to obtain defendants' voluntary compliance with many of these production defaults, defendants responded that discovery was "closed." (*See, e.g.*, Letters from Yen to Easterly dated February 12, 2002 and April 2, 2002, Ex. 41 to Lans Decl.).

Stepping back for a moment to view the big picture, I note Yen complains in the May 22 surreply that "[t]he Met treats the [Lans Declaration] as if it were a pleading, and contends that all statements not specifically denied are somehow deemed admitted by the defendants" and then points out that in her declaration she "do[es] in fact deny each and every allegation of misconduct that the Met claims supports an order of judgment and sanctions." (Yen 5/22/02 Ltr. at 2 n. 4). Again, Yen is technically correct, but the inference she wishes to draw is substantively wrong. The Lans Declaration was lengthy and extremely detailed. As noted above, after preliminarily reviewing it and hearing defendants' views, I found the motion (and thus the declaration) not to be frivolous. In her opposing declaration, Yen does in fact "declare that each and every allegation of perjury, obstruction, destruction, and spoliation of evidence, made by the Met against defendants, me, my colleagues at the law firm of Herrick Feinstein and co-counsel Michael T. Anderson is untrue." (Yen Decl. ¶ 2). Passing the evidentiary value of the hearsay portion of that broad denial, even the first person conclusory denial is of little effect in countering the specific, detailed evidentiary material proffered by the Met.

Moss, the Herrick Feinstein partner in charge of the case during the bulk of the discovery proceedings and involved in the court appearances and discovery conferences from early fall 2001 to the present, submitted no declaration in opposition to the motion. Thus, it is not clear whether Yen, a young associate who joined the Herrick Feinstein firm and came into this case in October 2001, was wholly unsupervised in her conduct of discovery from October 2001 through compliance discovery or whether she was subject to Moss' (or someone else's) supervision and acquiescence. Even if Moss failed to supervise Yen actively, (e.g., Yen explained that the Union filed no Rule 34 Response to the Met's Fourth Document Request because "at the time the matter was transitioned from Darlene Fairman [, another Herrick Feinstein associate,] to [Yen]," (Yen 5/22/02 Ltr. at 5)), such a failure by the partner in charge in the face of Met counsel's constant complaints of no adequate search and demonstra-

tions of inadequate production rises far above carelessness to willfulness. Of course, if Moss did supervise Yen and acquiesce in her actions (and non-actions), the result is the same—a willful failure to engage in discovery responsibly. Either way, Moss' silence is deafening.

## IV. THE MET'S MOTION FOR SANCTIONS REGARDING THE SUBPOENAE OF THE MET DIRECTORS AND WARD'S DEPOSITION

### A. The Met Directors

On November 26, 2001, I held a teleconference with the parties regarding defendants' intention to depose six Met Directors as third-party witnesses. Despite the Met's objections to these depositions, I allowed them to go forward on a limited basis and I directed the Met to produce certain documents on an expedited basis. Because the discovery deadline at the time was December 31, the Directors were also ordered to conduct an expedited document search and to make themselves available in December; some of them rearranged their holiday and vacation schedules to comply. (Grubin Aff. ¶¶ 3, 8). As such, the Directors and Met counsel spent approximately two weeks scheduling these depositions and preparing the witnesses. (Id. ¶ 6). On December 13, the Met confirmed that the Directors would be deposed on December 18, 19, 20, 27 and 28. (Id. ¶¶ 7–8).

On December 12, the Union issued a subpoena to Grubin requiring her to appear for a deposition on December 27. (Id. ¶ 10). The next day, Grubin and Lans met with two of the Directors to prepare for their depositions. (Id. ¶ 11). Shortly after these meetings, however, they learned that the Union's counsel had informed Easterly that afternoon that they no longer wished to depose five of the six Directors noticed. (Id.). In addition, the Met learned that the Union had served another subpoena on an employee of the Met Opera Guild to take her deposition on December 31. (Grubin Aff. ¶ 11). As a result, the Met filed an application seeking the Met's attorneys' fees incurred in preparing for the depositions that were cancelled and

that the newly-noticed depositions be precluded.

Pursuant to my direction that a person with knowledge explain what had transpired, Yen submitted an affidavit. According to Yen, the defendants issued subpoenas to the six Met Directors, with copies to Met counsel by regular mail, on November 20, 2001, for various dates in December. (Yen Aff. ¶ 4). Before the subpoenas had been successfully served, the Met's attorneys had received them and moved to quash. (Id. ¶ 5). As previously noted, a teleconference was held on November 26, and I directed that the depositions proceed. (Id. ¶ 5).

As Yen collected documents relating to the Directors and reviewed testimony from the PI Hearing, she "became focused on the fact that Grubin had testified to conversations at a board meeting relating to defendants' activities and had testified to receiving instructions from the Board" and Yen therefore "came to believe that Ms. Grubin waived any attorney client privilege as to her conversations with Met directors on the subject." (Id. ¶ 6). On November 27, Moss deposed the Met's General Manager, Joseph Volpe, and learned facts that led Union counsel to doubt the Met's previous assertion of an attorney-client privilege and therefore that additional ground could be explored. (Id. ¶ 7). Defendants also deposed James Naples, the Met's House Manager, on December 7. (Yen 1/2/02 Aff. ¶ 8). After speaking with a non-party on December 10 and reviewing Naples' deposition testimony, Moss and Yen decided on December 12 that it was more important to depose other individuals related to the Met than the Directors. (Id. ¶ 10). Accordingly, on the afternoon of December 12, Yen began drafting subpoenas for these new individuals, which were finalized on December 13. (Id. ¶¶ 11–12). "Given the previous difficulty in serving the Met's directors," Moss and Yen waited to get confirmation of service before formally cancelling the Directors' depositions. (Id. ¶ 12). When Easterly called Yen on December 14, Yen told Easterly that the defendants intended to cancel all except one of the Directors' depositions. (Id. ¶ 13).

On April 25, by letter to the Court, Grubin responded to Yen's Affidavit, reiterated the Met's request for sanctions with regard to the Met Directors' depositions, and supplemented that application to request similar relief regarding the deposition of Peter Ward. Grubin stated, "the misconduct recounted herein should be considered also on our motion for judgment since [it is] part of the events which have prevented the Met from being able to proceed with its case in an orderly fashion and develop evidence in the normal course of discovery." (Grubin 4/25/02 Ltr. at 1).

B. Ward's Deposition

On December 5, the Met served a subpoena on Peter Ward for a deposition on Friday, December 21, then—in the rush to conclude discovery—the only date available to all counsel for a deposition. (See Order dated December 19, 2001 ("December 19 Order") ¶ 3, Ex. 30 to Lans Decl.).[25] Despite the fact that counsel had been in contact on a daily basis throughout December about the discovery schedule, it was not until December 14— nine days after Ward's subpoena—that Yen informed Met counsel that Ward's deposition had to be rescheduled to mid-January because he was going on vacation and his flight was leaving the morning of December 22. (Grubin 4/25/02 Ltr. at 6–7). Met counsel offered to depose Ward on December 21 or 22 prior to his departure, but Union counsel refused. (Id. at 7). When Union counsel informed Met counsel that Ward was unavailable on any day during the week of December 17, Met counsel wrote to the Court requesting that Ward appear on the 21st, the previously-scheduled date, or on the 19th or 20th. (Id.). In a teleconference with the Court on December 18, Yen represented to Met counsel that Ward was "gonna be on an airplane" on the 21st, despite having previously stated that Ward was leaving on the 22nd. (Id. at 8). When Met counsel sug-

---

25. Mr. Ward was Vice President for the New York Region 1 of the Hotel Employees and Restaurant Employees International Union and held numerous meetings with Local 100 and RA regarding the situation at the Met. Ward was represented by the Herrick Feinstein attorneys. (See Stillman & Easterly Letter to the Court dated December 17, 2001).

gested that Ward could take a plane on the 22nd (and presumably be deposed on the 21st), Yen replied "He's going away with his family, come on. It's Christmas vacation." (*Id.*). After more discussion between counsel and in light of Yen's representation that Ward would be "getting on a plane" on the 21st and the discovery cut-off and impending trial, I ordered that Ward be deposed for three hours prior to his departure and, if necessary, that the deposition be completed upon his return. (December 19 Order, Ex. 30 to Lans Decl.).

Moss requested a teleconference on the morning of December 19 (without consulting with Met counsel). (Grubin 4/25/02 Ltr. at 9). In that teleconference, Moss stated that Ward's vacation was to begin on the 20th (not the 22nd or the 21st, as Yen had represented *seriatim*) and that it would be "impossible" for Ward to be deposed prior to his departure. I reiterated my prior ruling of December 18 that Ward sit for three hours of his deposition before leaving. Instead of immediately contacting Ward and then promptly informing Met counsel when he could sit for his court-ordered deposition, (as Union counsel had undertaken to do, *see* Grubin 4/25/02 Ltr. at 9), Yen called Grubin at 3:45 p.m. on December 19 to say that Ward would be available for his deposition at 4:00 p.m., that is, fifteen minutes later. (*Id.*). When Grubin stated that she might not be able to contact Lans (who Yen knew was to take the deposition) and that, even if she could, it was unlikely Lans could physically arrive at the Herrick Feinstein office on fifteen minutes notice, Yen replied that "her 'marching orders' were to get a court reporter and notify [Met counsel] that Mr. Ward would be available at 4:00." (*Id.*). Grubin was not able to reach Lans until an hour later, and at that time, Met counsel were told that it was too late for Ward. (*Id.*). Following these devel-

opments, another teleconference was held, and, based on Ward's supposed vacation plans, I ordered that his deposition proceed on January 7.[26] (*See* Grubin 4/25/02 Ltr.).

On December 20, Moss and Lans agreed to start the Ward deposition on January 7 at 9:30 a.m., but on December 21, during a conference call, Moss requested that Ward's deposition be rescheduled to January 10 because of "long-scheduled meetings." (*Id.* at 10). I refused defendants' request and directed Ward to be deposed on January 7 or 8, but after much discussion, it was agreed that Ward would be deposed on January 11 for the entire day. (*Id.*). On January 10, Moss called Easterly and stated that the deposition could not begin at 9:30 as scheduled because Ward had a pre-operative appointment but that Ward would be there at 11:00 and stay as late as necessary. Ward arrived around noon. (*Id.*).

A few minutes into the deposition, Ward and Moss took a short recess to discuss whether or not Moss was representing Ward. They determined that he was. The deposition continued:

Q: You were on vacation this winter in December at some point?

A: Yes, I was.

Q: Where did you go?

A: Where did I go?

Q: Yes.

THE WITNESS: Is that something I need to discuss at this deposition?

Q: Yes. You had a deposition scheduled and we had a great deal of difficulty which the judge is privy to in terms of scheduling it and I'm just trying to understand where you went and what dates you went.

A: I don't think I'm going to get into that with you.

---

**26.** As noted below, Ward testified that he had been called that morning and told to "drop everything" and appear for his deposition and that he "[w]ent over to Mr. Moss' offices and had been told after sitting there for almost two hours that the other side had decided they weren't prepared to go forward that day...." (Deposition of Peter Ward ("Ward Dep.") at 213, Ex. F to Grubin 4/25/02 Ltr.). Moss and Yen have not explained why they waited until 3:45 to notify Met counsel of Ward's newly-discovered avail-

ability. Indeed, in surreply papers on this issue, Moss remained silent, and Yen omitted any reference to the lack of adequate notice. In what can most charitably be described as a less than complete response, Yen stated only that "after Met counsel insisted in a conference call with the Court that Mr. Ward be produced forthwith, he appeared on December 19, 2001 for his deposition, only to be told that Ms. Lans was not prepared to begin the deposition." (Yen 5/22/02 Ltr. at 3).

Q: What dates were you on vacation?

A: I don't recall the exact dates. It was over the holiday.

Q: Do you have a date book?

A: Not with me.

Q: You have one in your office?

A: I do.

Q: Does it reflect the dates that you were out on vacation?

A: I'm quite certain it does.

Q: I'm going to ask you to provide us with the pages that show that.

MR. MOSS: And we will take that under advisement.

Q: Now, when did you first tell Mr. Moss that you had a doctor's commitment this morning?

A: I don't recall.

Q: Yesterday?

A: Yesterday or the day before.

Q: When did you first learn that we were going to take your deposition today? Was it some weeks ago?

A: It was—I believe this date was agreed to prior to when I went on vacation.

Q: Okay.

Were you told at the time that you learned of this date that it was an 11 o'clock deposition or a 9:30 deposition?

A: I wasn't given a time.

Q: You weren't given a time?

A: No, not that I recall.

Q: Were you advised about the date in writing or over the telephone?

A: I don't recall.

 \* \* \* \* \* \*

Q: Were you ever told that the deposition was going to be on January 7th?

MR. MOSS: You're asking him about communications with counsel or outside?

MS. LANS: I don't think this would be a privileged communication, Jim, whether it was from counsel or otherwise. The scheduling of a deposition is hardly a privileged matter.

MR. MOSS: I'm going to advise, ask the witness not to respond to any question that calls for him to discuss matters that he and I have spoken about.

MS. LANS: Even the scheduling of this deposition?

MR. MOSS: Right.

MS. LANS: You regard that as confidential?

MR. MOSS: Yes.

MS. LANS: Okay. We'll deal with it.

(Ward Dep. at 20–23, *quoted in* Grubin 4/25/02 Ltr.).

Ward later stated that he had to leave at 4:30, and Moss "insisted that the Court had ordered that the deposition be limited to three hours." (*Id.* at 13). The parties agreed to continue the deposition on January 28. On January 16, Moss requested that it be rescheduled to January 31. On January 31, Lans noticed that Ward's date book had a notation about a Giants football game on December 23. When Lans asked him whether he had spent his vacation in New York, Ward refused to respond, counsel called the Court, and I directed Ward to respond. Ward then testified that he spent his vacation at home in New York from December 21 through January 6. (Ward Dep. at 215, Ex. F to Grubin 4/25/02 Ltr.). In that recorded teleconference during his deposition, Ward stated that he never told anyone that he was getting on a plane. (*Id.* at 210).

## V. DISCUSSION

### A. Applicable Legal Standards

The Met now moves for judgment, attorneys' fees, and further relief pursuant to Rules 26 and 37 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and the Court's inherent power.

Rule 26(g)(2) provides that:

[E]very discovery request, response, or objection made by a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name, . . . [which] constitutes a certification that to the best of the signer's knowledge, information, and belief, *formed after a reasonable inquiry,* the request, response, or objection is:

(A) consistent with [the Federal Rules] and warranted by existing law or a good faith argument ...; (B) not interposed for any improper purpose ...; and (C) not unreasonable or unduly burdensome.

Fed.R.Civ.P. 26(g)(2)(A)–(C) (emphasis added). Rule 26(g) imposes on counsel an affirmative duty to engage in pretrial discovery responsibly and "is designed to curb discovery abuse by explicitly encouraging the imposition of sanctions." Fed.R.Civ.P. 26(g) Advisory Committee Notes to 1983 Amendment. Furthermore, the Rule

provides a deterrent to both excessive discovery and evasion by imposing a certification requirement that *obliges each attorney to stop and think about the legitimacy of a discovery request, a response thereto, or an objection.* The term "response" includes answers to interrogatories and to requests to admit as well as responses to production requests.

(*Id.,* emphasis added).

Rule 37 addresses a variety of discovery failures that are without justification and not harmless, including failure to obey a discovery order and failure to comply with Rule 26(e) obligations (supplementing responses). Like Rule 26, Rule 37 is intended to encourage and enforce strict adherence to the "responsibilities counsel owe to the Court and to their opponents," *National Hockey League v. Metro. Hockey Club, Inc.,* 427 U.S. 639, 640, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976); *see also Penthouse Int'l, Ltd. v. Playboy Enters.,* 663 F.2d 371, 387 (2d Cir.1981), and authorizes a court to impose a variety of sanctions, including default judgment, *see* Fed.R.Civ.P. 37(c)(1) (incorporating Rule 37(b)(2)(C) which authorizes default judgment); *Communispond, Inc. v. Kelley,* No. 96 Civ. 1487, 1998 WL 473951, at *5 (S.D.N.Y. Aug. 11, 1998) (entering default judgment under both Rule 37(b)(2) and 37(c)). Like Rule 26, Rule 37 authorizes imposition of sanctions for negligence or tactical intransigence as well as willful or intentional wrongs. *See Penthouse,* 663 F.2d at 387; *Beers v. General Motors Corp.,* No. 97–CV–482, 1999 WL 325378, at *4 (N.D.N.Y. May 17, 1999); *Altschuler v. Samsonite Corp.,* 109 F.R.D. 353, 356 (E.D.N.Y.1986).

In *Residential Funding Corporation v. DeGeorge Financial Corporation,* 306 F.3d 99 (2d Cir.2002), the Court of Appeals recently reviewed some of the procedures set forth in Rule 37 for sanctioning discovery misconduct and emphasized that a court has "broad discretion in fashioning an appropriate sanction." *Id.* at 107. Courts have also noted Rule 37 sanctions may be applied both to penalize conduct that warrants sanctions and "to deter those who might be tempted to such conduct in the absence of such a deterrent." *National Hockey League,* 427 U.S. at 643, 96 S.Ct. 2778; *see also Penthouse,* 663 F.2d at 386. In Rule 37 cases, intentional behavior, actions taken in bad faith, or grossly negligent behavior justify severe disciplinary measures. *See Penthouse,* 663 F.2d at 387; *Altschuler,* 109 F.R.D. at 356. The *Residential Funding* court also recalled earlier holdings that in determining whether evidence was made unavailable by a party with a culpable state of mind, the sanction of an adverse inference instruction was also available for negligent conduct. *See* 306 F.3d at 108 (citing *Byrnie v. Town of Cromwell,* 243 F.3d 93, 109 (2d Cir.2001)); *Reilly v. Natwest Markets Group, Inc.,* 181 F.3d 253, 268 (2d Cir.1999); *see also Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 75 (S.D.N.Y.1991) ("[The] sanction [of an adverse inference] should be available even for the negligent destruction of documents if that is necessary to further the remedial purpose of the inference. It makes little difference to the party victimized by the destruction of evidence whether that act was done willfully or negligently. The adverse inference provides the necessary mechanism for restoring the evidentiary balance. The inference is adverse to the destroyer not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss.").

There are no specific requirements for the imposition of sanctions under Rule 37; rather, the decision is left to the sound discretion of the trial court. *See Lyell Theatre Corp. v. Loews Corp.,* 91 F.R.D. 97, 99 (W.D.N.Y.1981), *aff'd,* 682 F.2d 37 (2d Cir.

1982); *A.V. by Versace, Inc. v. Gianni Versace*, No. 96 Civ. 9721, No. 98 Civ. 0123, 2002 WL 54610, at *7 (S.D.N.Y. Jan. 15, 2002). Over time, however, courts have identified relevant considerations to assist in deciding whether discovery abuse warrants the entry of judgment, including: " '(a) willfulness or bad faith of the noncompliant party; (b) the history, if any, of noncompliance; (c) the effectiveness of lesser sanctions; (d) whether the noncompliant party had been warned about the possibility of sanctions; (e) the client's complicity; and (f) prejudice to the moving party.' " *In re Sumitomo Copper Litig.*, 204 F.R.D. 58, 60 (S.D.N.Y.2001) (quoting *Yucyco, Ltd. v. Ljubljanska Banka*, No. 96 Civ. 4274, 2001 WL 699135, at *4 (S.D.N.Y. June 20, 2001)); *American Cash Card Corp. v. AT & T Corp.*, 184 F.R.D. 521, 524 (S.D.N.Y.1999), *aff'd mem.*, 210 F.3d 354 (2d Cir.2000). In addition, a court may consider the "need to deter discovery abuse and efficiently control dockets." *In re Sumitomo*, 204 F.R.D. at 60.

█ Pursuant to 28 U.S.C. § 1927:

[a]ny attorney or other person admitted to conduct cases in any court of the United States ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927 (2002 revised ed.). Under that statute, a party must show bad faith, which is satisfied when "the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir.1986).

█ Finally, in *Residential Funding*, the Court of Appeals reiterated that "[e]ven in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." 306 F.3d at 106–07 (citing *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 135–36 (2d Cir.1998)); *see generally Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) ("it has long been understood that '[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court because they are necessary to the exercise of all others' ") (quoting *United States v. Hudson*, 7 Cranch 32, 34, 3 L.Ed. 259 (1812)). Like sanctions under § 1927, sanctions under the Court's inherent power require a finding of bad faith. Unlike § 1927, however, where a court may only sanction attorneys, under its inherent power, a court may impose sanctions on an attorney, a party, or both. *See Sassower v. Field*, 973 F.2d 75, 80–81 (2d Cir.1992).

### B. Sanctions are Warranted in This Case

█ At the outset, I recognize the Court of Appeals' instruction that the entry of judgment against a defendant or "[d]ismissal with prejudice is a harsh remedy" that should be used "only in extreme situations ..., and then only when a court finds willfulness, bad faith, or any fault on the part of [the litigant]." *Valentine v. Museum of Modern Art*, 29 F.3d 47, 49 (2d Cir.1994) (quoting *Bobal v. Rensselaer Polytechnic Inst.*, 916 F.2d 759, 764 (2d Cir.1990) (internal quotation marks omitted, second alteration in original)). Nevertheless, a court " 'should not shrink from imposing harsh sanctions where ... they are clearly warranted.' " *Jones v. Niagara Frontier Transp. Auth.*, 836 F.2d 731, 735 (2d Cir. 1987) (quoting *Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir.1979) (alteration in original)). In addition, "unless Rule 37 is perceived as a credible deterrent rather than a 'paper tiger,' the pretrial quagmire threatens to engulf the entire litigative process." *Air–India v. Goswami*, No. 91 Civ. 7290, 1993 WL 403999, at *1 (S.D.N.Y. Oct. 5, 1993) (citing *Cine Forty–Second St.*, 602 F.2d at 1064). Indeed, as then-District Judge Sotomayor noted in *535 Broadway Associates v. Commercial Corporation of America*, 159 B.R. 403, 407 (S.D.N.Y.1993), "this circuit's recent decisions have made clear that the era when courts shied away from the imposition of the full range of sanctions enumerated in

Rule 37, including dismissal, is a thing of the past."

In my consideration of the Union's and its counsel's conduct in this case, two statements are particularly apt. In *National Association of Radiation Survivors v. Turnage,* 115 F.R.D. 543 (N.D.Cal.1987) now-Chief Judge Patel wrote:

> The [defendant's] various discovery omissions are directly attributable to the failure of defendant and its counsel to establish a coherent and effective system to faithfully and effectively respond to discovery requests.... [T]he defendant employed an unconscionably careless procedure to handle discovery matters, suggesting a callous disregard for its obligations as a litigant.
>
> \* \* \* \* \* \*
>
> The court concludes that defendant and its counsel failed in a variety of instances to conduct any reasonable inquiry into the factual basis of its discovery responses.... Such an inquiry would have required, at a minimum, a reasonable procedure to distribute discovery requests to all employees and agents of the defendant potentially possessing responsive information, and to account for the collection and subsequent production of the information to plaintiffs.

*Id.* at 556. With equal applicability to this case, Judge Kugler wrote in *Tarlton v. Cumberland County Correctional Facility,* 192 F.R.D. 165 (D.N.J.2000):

> It is not an excuse that defense counsel did not know about the retention of the cover sheets. Counsel had a duty to ex-

plain to their client what types of information would be relevant and responsive to discovery requests and ask how and where relevant documents may be maintained. The client is charged with knowledge of what documents it possesses. *It was not their option to simply react to plaintiff's fortuitous discovery of the existence of relevant documents by making disjointed searches, each time coming up with a few more documents, and each time representing that that was all they had.* Under the federal rules, the burden does not fall on plaintiff to learn whether, how and where defendant keeps relevant documents.

*Id.* at 170 (emphasis added).

### 1. Rule 26

As is apparent from the lengthy factual recitation above,[27] Union counsel's participation in and supervision of discovery in this case was in no way "consistent with the spirit and purposes of Rules 26 through 37," and mandatory sanctions under Rule 26(g) must be imposed. Fed.R.Civ.P. 26(g) Advisory Committee Notes to 1983 Amendment. Counsel had an affirmative duty under Rule 26(g) to make a reasonable inquiry into the basis of their discovery responses and to "stop and think about the legitimacy of [those responses]." *Id.* Instead, as is crystal clear in hindsight, counsel's responses to the Met's discovery requests, in formal responses, in letters [28] and to the Court—particularly counsel's repeated representations that all responsive documents had been produced—were made without any real reflection or

---

**27.** Despite the length of the factual recitation, it is far from a complete catalog of the discovery failures perpetrated by the Union and its counsel. Exhibit 60 to the Lans Reply Declaration is a copy of the Lans Declaration, the factual recitation upon which the Met's motion is primarily based, marked to indicate which statements were or were not contested in the Union's opposing papers. A review of that document demonstrates that the lengthy, detailed statements in the Lans Declaration setting out innumerable discovery failures by the Union and its counsel are, for the most part, uncontested. (Defendants have not challenged Lans' markings as to which items were and were not contested). In this Opinion, in an obviously futile effort toward brevity, I have only set out representative examples of the failures demonstrated.

Also, although the requirements for sanctions under the statutes and rules relied on by the Met differ, many of the relevant considerations are applicable to the analysis under all of the rules and statutes involved. For example, the considerations that have evolved from the cases under Rule 37 certainly inform a court's judgment on the exercise of its inherent power. Accordingly, although I have grouped certain facts and considerations under one or another of the statutes or rules discussed, I have considered all of the applicable facts and factors in the record for each statute and rule relied on by the Met.

**28.** Sanctions may be imposed under Rule 26(g) for false statements in letters about completeness of disclosure as well as in formal responses to document requests. *See, e.g., Phinney v. Paulshock,* 181 F.R.D. 185, 203–04 (D.N.H.1998).

concern for their obligations under the rules governing discovery and, in the absence of an adequate search for responsive documents, without a reasonable basis. *See National Ass'n of Radiation Survivors*, 115 F.R.D. at 556 (defendant's employment of an "unconscionably careless procedure to handle discovery matters, suggesting a callous disregard for its obligations as a litigant," warranted sanctions). Especially troubling, and of great weight in my decision to impose the most severe sanction, is that counsel's conduct was not merely negligent but was aggressively willful. Union counsel's repeated representations of full production were made in response to Met counsel's continuing high-decibel allegations of failure to make adequate inquiry and repeated demonstrations of incomplete compliance and non-compliance with discovery requests. Met counsel's questions began soon after discovery commenced and continued unabated throughout the case. Union counsel were given numerous last clear chances to comply with their discovery obligations. That, in response, Local 100's counsel continually [29] professed full compliance—falsely and, as confirmed by compliance discovery, without making a reasonable inquiry—constitutes such gross negligence as to rise to intentional misconduct. *See Oliveri*, 803 F.2d at 1273 (bad faith is shown when "the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay"); *see also Residential Funding*, 306 F.3d at 108 ("a 'case-by-case approach to the failure to produce relevant evidence' was appropriate because '[s]uch failures occur along a continuum of fault—ranging from innocence through degrees of negligence to intentionality' ") (citing *Reilly*, 181 F.3d at 267) (internal quotation marks and citation omitted).

Counsel's primary defense to their Rule 26(g) violation is to assert that there is no requirement that counsel "personally supervise every step of the discovery process" and that "counsel is expected to rely on the client's initial document production." (D.Memo. 19).[30] While, of course, it is true that counsel need not supervise every step of the document production process and may rely on their clients in some respects, the rule expressly requires counsel's responses to be made upon reasonable inquiry under the circumstances. *See* Fed.R.Civ.P. 26(g) Advisory Committee Notes to 1983 Amendment (attorney's certification under Rule 26(g) signifies "that the lawyer has made a reasonable effort to assure that the client has provided all the information and documents available to him that are responsive to the discovery demand."). Here, there is no doubt whatsoever that counsel failed to comply with that standard in that, among other things, counsel (1) never gave adequate instructions to their clients about the clients' overall discovery obligations, what constitutes a "document" or about what was specifically called for by the Met's document requests; (2) knew the Union to have no document retention or filing systems and yet never implemented a systematic procedure for document production or for retention of documents, including electronic documents; (3) delegated document production to a layperson who (at least until July 2001) did not even understand himself (and was not instructed by counsel) that a document included a draft or other non-identical copy, a computer file and an e-mail; (4) never went back to the layperson designated to assure that he had "establish[ed] a coherent and effective system to faithfully and effectively respond to discovery requests," *National Ass'n of Radiation Survivors*, 115 F.R.D. at 556; and (5) in the face of the Met's persistent questioning and showings that the production was faulty and incomplete, ridiculed the inquiries, failed to take any action to remedy the situation or supplement the demonstrably false responses, failed to ask important witnesses for documents until the night before their depositions and, instead, made repeated, baseless representations that all documents had been produced. In-

---

**29.** *See* Lans Reply Declaration at ¶ 102, which lists Union counsel's repeated representations from May 2, 2000 to December 30, 2001 that discovery responses were complete.

**30.** Reference is to Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Judgment and Attorneys' Fees filed May 2, 2002.

deed, given the almost complete disconnect between counsel (who had the document requests but knew nothing about the documents in the Union's possession other than that the files were in disarray and there was no retention system) and defendants (who had the documents but were entirely ignorant of the requirements of the requests), there is simply no way that any discovery response made by counsel could have been based on a reasonable inquiry under the circumstances. *See Phinney v. Paulshock,* 181 F.R.D. at 204 (Rule 26(g) sanctions imposed where lawyer "could not have known whether his clients had made a 'significant search,' but he nonetheless led plaintiffs to believe that every effort had been made to comply with their requests").

Defendants' brazen assertion that looking at "comprehensive productions ... there was no reason for any of [the Union's] counsel to question the completeness of the production," (D.Memo. 19–20), betrays their willful disregard of their discovery obligations. Certainly when counsel learned that their clients, for over a year after the commencement of the litigation, had not understood that e-mails were called for and had not retained electronic documents or drafts, they should have had "reason to question" the completeness of defendants' productions (and the adequacy of their own supervision). *Cf. Patsy's Brand, Inc. v. I.O.B. Realty, Inc.,* No. 98 Civ. 10175, 2002 WL 59434, at *8 (S.D.N.Y. Jan. 16, 2002) (where "all of facts available to [counsel] should have convinced a lawyer of even modest intelligence that there was no reasonable basis on which they could rely on [their clients'] statements," Rule 11 sanctions warranted). Yet counsel persisted in ignoring, indeed belittling, the Met's inquiries concerning the patent lack of production of e-mails, computer files and drafts until July 18, 2001 when I told them—fourteen months after the start of this litigation—that their failure to search for and to have instructed their clients to save computer-generated documents was inexcusable and directed them to inquire of their clients and to comply with their discovery obligations forthwith. (*See* Letter from

Stillman to Saltzman & Anderson dated July 18, 2001, Ex. 76 to Lans Reply Decl.). Even then, counsel's disregard for their obligations continued, and *no attorney performed any significant review of Union files until January 10, 2002—after the close of discovery and then only in order to respond to discovery compliance interrogatories.*[31] Incredibly, that lawyer still failed to search numerous files, failed to interview several Union employees and conducted only the most superficial review of major files. (*See* Lans Reply Decl. ¶ 29(b)-(d)). In addition, counsel never inquired about the contents of the Union's document storage facility. (*See* Yen Dep. at 91, Ex. 46 to Lans Decl.).

Through counsel's oversight, the Union never responded to the Met's Fourth Document Request at all. (*See* Yen 5/22/02 Ltr. at 5, explaining that at that time the matter was "transitioning" from another associate to Yen). Even the responses to discovery compliance inquiries could not have been based on reasonable inquiry. For example, in response to Interrogatory No. 4 seeking the details of steps taken to respond to the Met's document requests, the Herrick Feinstein firm responded, in part, that in response to the Met's first document request, Lynett "searched Local 100's files, including all researchers' files and any other files that might contain responsive documents." (Local 100's Responses at 3, Ex. 54 to Lans Decl.). At his subsequent deposition, however, Lynett testified that the only files he looked at were materials Granfield and Bitterman had assembled, some files and a file cabinet next to Bitterman's desk, a file cabinet next to Granfield's desk and a file cabinet next to Diaz's desk. (Lynett Dep. at 39–42, Ex. 44 to Lans Decl.). In addition, as set out in excruciating detail at paragraph 32 of the Lans Reply Declaration, scores of clearly responsive documents (some of which, like Weekly Reports, were expressly ordered to be produced) have never been produced.

Now, with the benefit of the several inches of correspondence attached to the Lans Declaration, it is plain that Union counsel failed

---

**31.** As noted in the factual recitation, Mr. Lynett did review some files in three file cabinets prior to the PI Hearing. It is undisputed, however, that no attorney attempted anything more extensive or anything like a general review until January 10, 2002.

in their duty "to explain to their client what types of information would be relevant and responsive to document requests and ask how and where relevant documents may be maintained." *Tarlton*, 192 F.R.D. at 170. Instead they "simply react[ed] to [Met counsel's] fortuitous discovery of the existence of relevant documents by making disjointed searches, each time coming up with a few more documents, and each time representing that that was all they had." *Id.* Sometimes they did not even go to the trouble of making a disjointed search but just stated that no responsive documents exist when that representation was demonstrably false. (*E.g., compare* the Union's response to the Met's Third Document Request, signed by Moss, stating that the Union has no documents concerning benefits to its members and their families, *with* the Minutes, Ex. 69 to Lans Decl., that refer to Report of New Benefits (10/23/99), Local 100 Welfare Fund Meeting to be run by Tamarin discussing changes to medical, dental and pension benefits (3/4/00), report reviewing new/improved benefits (7/12/00)).

Finally, Union counsel's attitude toward their discovery obligations is perhaps best reflected in several of their Spring 2002 responses. As I have noted repeatedly, Met counsel began questioning the adequacy of defendants' document search and document production almost from the outset of the case. By July of 2001, it was apparent that at least some electronic documents had not been preserved. As set out above, because of the continuing, serious questions about defendants' compliance with their discovery obligations, I permitted the Met to propound discovery requests in early 2002 regarding defendants' compliance. It was in this context that Met counsel wrote to Union counsel yet again seeking production of long-requested, oft-promised documents. Instead of complying or taking some other action consistent with their discovery obligations, counsel demonstrated their utter contempt for their discovery obligations by mischaracterizing Met counsel's requests as new and responding that discovery had "closed" on December 31.

(Letter from Yen to Easterly dated April 2, 2002, Ex. 41 to Lans Decl.) ("I have earlier stated to you in writing that discovery has been closed for some time and we will not respond to new demands."). There can be no doubt that counsel's repeated representations that all responsive documents had been produced were not the result of a reasonable inquiry, that counsel failed to stop and think about their responses, and that counsel did not engage in discovery responsibly—all in violation of Rule 26. Just as in *National Association of Radiation Survivors*, the Union and its counsel failed "to establish a coherent and effective system to faithfully and effectively respond to discovery requests. . . . [Instead, they] employed an unconscionably careless procedure to handle discovery matters, suggesting a callous disregard for [their] obligations. . . ." 115 F.R.D. at 556.

### 2. Rule 37

▮ Sanctions are also appropriately imposed here under Rule 37, and the factors considered under that Rule also inform my judgment regarding sanctions under 28 U.S.C. § 1927 and the Court's inherent power.

#### a. Willfulness or Bad Faith

As the factual recitation above makes clear, there is ample evidence of willfulness and bad faith on the part of both counsel and the Union. First, as set out above, counsel's continuing representations of full compliance with the Met's discovery requests in the face of constant questions being raised by Met counsel about inadequate inquiries and inadequate production were so lacking in a reasonable basis as to rise to the level of bad faith.

Second, despite defendants' arguments to the contrary, (*see* Yen 5/22/02 Ltr. at 2–6), defendants have failed to comply with several court orders, also constituting willfulness and bad faith. Two examples relate to e-mails and the Weekly Reports.[32] As to my oral ruling at the July 18, 2001 conference re-

---

**32.** *See also infra* discussion of Moss' and Yen's machinations to avoid complying with the Court's order that Ward's deposition proceed

before he supposedly departed New York for vacation.

garding the retention of all documents, including electronic documents, (*see* Letter from Stillman to Saltzman & Anderson dated July 18, 2001, Ex. 76 to Lans Reply Decl.), Yen states that "defendants' counsel understood the Court to direct an investigation into the retention and production of Local 100's e-mails and to correct any deficiencies going forward," (Yen 5/22/02 Ltr. at 2). Even assuming that was the extent of the order, it was not complied with. Among other things, there is no indication that all of Local 100's computers were searched, (Lans Decl. ¶ 27), Granfield's supposed search was only superficial, (Granfield Dep., Ex. 43 to Lans Decl. at 410), and Bitterman did not contact all of the Union's ISPs, as Anderson had represented he would, (Lans Decl. ¶¶ 26, 29, 77). In any event, as noted above, all responsive e-mails have never been produced. (*See* discussion *supra* Part III.B.3). Also, Granfield, the Union's current president, admitted that he failed to save documents and deleted documents from his diskette right up until his discovery compliance deposition. (Granfield Dep. at 530–35, Ex. 43 to Lans Decl.). He never gave the diskette to counsel, (*id.* at 405), and Yen never asked about it, (*id.* at 534).

With regard to the Weekly Reports, at a recorded teleconference on January 7, 2002, I ordered the Union to produce those Reports that had not already been produced. (1/7/02 Tr. at 18–22, Ex. 32 to Lans Decl.). While the parties dispute the scope of the order, it is clear that, at a minimum, the Reports for Tamarin, Granfield and Bitterman were to be produced. Although the existence of Bitterman's Reports remains in dispute,[33] complete production has still not been made of the Reports for Tamarin and Granfield. (Lans

Reply Decl. ¶ 32). Accordingly, there is no doubt that the defendants remain in violation of valid court orders. *See Daval Steel Prods. v. M/V Fakredine,* 951 F.2d 1357, 1363 (2d Cir.1991) ("Provided that there is a clearly articulated order of the court requiring specified discovery, the district court has the authority to impose Rule 37(b) sanctions for noncompliance with that order.").

Third, the falsehoods uttered by individual defendants and by Union counsel as to simple but material factual matters also constitute willfulness and bad faith requiring severe sanctions. For example, in his October 16, 2001 deposition, Granfield denied providing any "written reports ... to the International with respect to [his] activities," (Granfield Dep. at 98, Ex. 43 to Lans Decl.), and denied that there were any "pieces of paper in [his] files that would indicate that [he] tall[ied] up what the vote would look like from time to time," (*id.* at 137).[34] In his November 15, 2001 deposition, however, Diaz testified that he and, *inter alia,* Granfield filled out reports of "[t]he weekly work that was done." (Diaz Dep. at 132, Ex. 50 to Lans Decl.). In his March 25, 2002 discovery compliance deposition, Granfield admitted that he prepared weekly "reports on [his] activities" that were sent to the International during 1999, 2000 and 2001, (Granfield Dep. at 439, Ex. 43 to Lans Decl.), and that the reports provided "a tally of the number of authorization cards that had been signed each week," (*Id.* at 453). Although Granfield explains by affidavit essentially that he misunderstood the questions, his explanation is incredible in light of the clarity of the question asked. ("In the period from January 1999 to the present, have you or Mr. Tamarin

---

**33.** After initially stating that Bitterman had prepared and filed Weekly Reports and that they would be produced, (*see, e.g.,* Easterly Letter to Yen dated December 10, 2001, Ex. 27 to Lans Decl.), the Union later asserted that Bitterman, alone among all Local 100 officials who worked on the Met campaign, had not prepared such reports, (*see, e.g.,* 1/7/02 Tr., Ex. 32 to Lans Decl.; Letter from Yen to Lans dated January 10, 2002, Ex. 35 to Lans Decl.).

Also indicative of counsel's approach to their discovery obligations is Yen's explanation in connection with the Weekly Reports, noted above, that "we had not before this realized that any-

thing in the [Union's] payroll or expense department was what was called for...." (1/7/02 Tr. at 19–20, Ex. 32 to Lans Decl.). It was only later, during compliance discovery, that it was learned that the "payroll department" was a secretary in charge of payroll who sat in an open area with everyone else in the Union's offices. (*See* Lans Decl. ¶ 55).

**34.** Similarly, in his testimony in a related NLRB proceeding, Diaz denied that he "log[ged] what [he did] on a day-to-day basis ... [, his] activities on behalf of Local 100." (Ex. 20 to Lans Decl. at 100).

provided any written reports to your knowledge to the International with respect to your activities?" (*Id.* at 98)). The Weekly Reports were called for in the Met's first document request (Ex. 1 to Lans Decl.) and were of obvious relevance in documenting activities that are the subject of this action. That Granfield falsely denied their existence and that all such reports have to date not been produced is ample evidence of bad faith by the Union.

### (i) The Ward Deposition

The machinations surrounding the deposition of Peter Ward further illustrate the bad faith with which defendants' counsel approached the discovery process and the Court's orders. As is set out above, these events occurred in December of 2001, less than a month before the discovery cut-off date. Despite the push to complete discovery (or perhaps because of it), Union counsel were tardy in informing Met counsel of Ward's supposed unavailability on account of his holiday vacation. There ensued some back and forth between counsel about rescheduling, but then in a conference call Yen represented to Met counsel and later to me that Ward would be "getting on a plane" on the day noticed. After more conferences and reschedulings, the deposition was taken over two days in January. After initially refusing to respond to the question of where and when he spent his vacation, Ward's calendar revealed attendance at a Giants game, and he was forced to admit that he spent his vacation at home in the New York area. He also stated in a recorded conference with the Court that he never told anyone that he was going to be on a plane. (Ward Dep. at 212–13, Ex. F to Grubin 4/25/02 Ltr.).

In response to the Met's motion, Yen says that she does "not even have a vague recollection of what precise words were said in the various telephone conversations that [she] had with the Met's counsel in December 2001" but that she does "remember exclaiming something along the lines of 'come on, it's Christmas vacation.'" (Yen Decl. ¶ 46). Yen also asserts that there was no "suggest[ion] that this Court was in any way misled," (*id.* at ¶ 44), and, in typical hindsight, much-ado-about-nothing fashion, that

"there was never any urgency to take Mr. Ward's deposition before Christmas, and there has been no prejudice to the Met from the fact that his deposition occurred in January instead," (*id.* at ¶ 47). Yen nowhere denies having represented that Ward was "getting on a plane."

As the Court of Appeals pointed out in *Residential Funding*, "as a discovery deadline ... draws near, discovery conduct that might have been considered 'merely' discourteous at an earlier point in the litigation may well breach a party's duties to its opponent and to the court." 306 F.3d at 112. Here, the discovery deadline was less than a month away, including the holidays, and as set out above, long-sought documents had still not been produced so numerous depositions remained to be completed as the deadline loomed. Thus, the pressure to complete discovery was as intense here as it was in *Residential Funding*. Here, in contrast to the *Residential Funding* situation which the district court characterized as "purposefully sluggish," 306 F.3d at 110 n. 5, the present record can only be read as reflecting deliberate falsehood and willful and deliberate delayed notice aimed at frustrating a court-ordered deposition.

Yen's statement to the Court that Ward was "getting on a plane" was crystal clear. In light of (1) Grubin's assertion that the statement was made, (2) Ward's testimony that he never told anyone that he was getting on a plane, (3) Yen's lack of recollection as to whether she represented Ward was getting on a plane, failure to deny that she did so represent and silence about whether Ward did or did not say he would be getting on a plane, and (4) the absence of an affidavit from Moss, the only inference that can be drawn is that Yen's statement was a deliberate falsehood intended to delay the court-ordered deposition. (*See* Lans Reply Decl. ¶¶ 89–90). Yen's assertion that the Court was not misled is patently untrue. Had I known the true facts about Ward's presence in the New York area in late December of 2001, I would have viewed the situation entirely differently. There is no doubt that I was misled by Yen's false representation.

In the same recorded conference during his deposition, Ward testified that he "was called th[e] morning [of December 19] and told to drop everything [he was] doing and make [himself] available for a deposition" and that he "[w]ent over to Mr. Moss' office and had been told after sitting there for almost two hours that the other side had decided they weren't prepared to go forward that day. . . ." (Ward Dep. at 213, Ex. F to Grubin 4/25/02 Ltr.). As set out above, Moss gave Yen "marching orders" to give Met counsel fifteen minutes notice of Ward's deposition on December 19, 2001. Because neither Moss nor Yen disputes Ward's testimony that he was called in the morning and "sat around" for some two hours in Moss' office before being told that Met counsel could not attend, the only inference to be drawn is that Moss instructed Yen to delay giving Met counsel notice in order to frustrate my order that Ward's deposition be started before Ward left on vacation.

Contrary to Yen's attempts to minimize those falsehoods and machinations, it is beside the point that, in her view, there was no urgency to the Ward deposition and no prejudice to the Met from taking the deposition in January, not December. The point is that under the circumstances, counsel's conduct was not "merely discourteous" but rather a breach of their responsibility to opposing counsel and the Court, *inter alia*, to engage in discovery in good faith, comply with court orders and, more fundamentally, to tell the truth. *See Residential Funding*, 306 F.3d at 112. There is no doubt that the circumstances surrounding the Ward deposition demonstrate bad faith by Moss and Yen. Accordingly, the Met's motion for sanctions based on Union counsel's behavior as to the Ward deposition is granted.

b. The History of Non–Compliance

As is set forth at length above, the Union and its counsel have failed to comply with their discovery obligations from the very outset of this action—from Mr. Lynett's representation at the PI Hearing that a thorough search of Local 100's offices had been made and responsive letters produced (May 24–26 Tr. at 24–25, Ex. 2 to Lans Decl.)—up to the close of discovery. (*See* Lans Reply Decl. at

¶ 102, specifying the assurances of compliance from May 2, 2000 to December 30, 2001). As also set out above, defendants' non-compliance and failure to make an adequate search has continued to the present in the face of continuing complaints from Met counsel. This factor weighs heavily in favor of the most severe sanctions.

c. The Client's Complicity

As is clear from the factual recitation and discussion of willfulness above, the discovery abuses evidenced here cannot be laid solely at counsel's door. Although the degree of the Union's complicity cannot be measured accurately on this record, that it was significant cannot be doubted. For example, the Union's failure to produce Weekly Reports proceeded initially from Granfield's false testimony that he prepared no log of his activities on behalf of the Union and that there were no documents reflecting the Union's view of the current vote tally.

The Union's failure to set up an adequate system for document production resulted primarily from the glaring omissions of Bitterman. Granfield put Bitterman, the Union's head researcher, in charge of assembling documents. (Granfield Dep. at 420, Ex. 43 to Lans Decl.). Bitterman, however, has no record or recollection of what steps he took to do so. He did not create a checklist or any other written record of what he did. (Bitterman Dep. at 441–42, Ex. 42 to Lans Decl.). He did not give written instructions regarding document production to anyone and does not recall giving copies of the Met's document requests to anyone. (*Id.* at 418–19). Instead, Bitterman "asked all staff to forward copies of all Met-related documents to be placed in a box for [the Union's] periodic rolling production." (Letter from Anderson to Stillman & Easterly dated July 23, 2001, Ex. 13 to Lans Decl.). Again passing what a "Met-related" document is (as opposed to a responsive document), even that representation by counsel is an overstatement in that Bitterman only spoke to some Union employees but by no means all who were likely to have responsive documents. For example, Bitterman never spoke to Rimmelin, (Rimmelin Dep. at 143–44, Ex. 45 to

Lans Decl.), who had been at the Local since its inception in 1983 and is the office manager, (*id.* at 5–6). Although Rimmelin knew that there was a basket somewhere that people were putting documents into for the case, she had no understanding of what documents were supposed to go into the basket and she has never put any there herself. (*Id.* at 43–44). Rimmelin keeps an inventory of documents in storage, (*id.* at 45), but, as noted above, was not asked about it by Bitterman, (*id.*).

Bitterman also made less than a good faith effort to produce documents that were responsive.[35] For example, although Bitterman knew throughout the case that Weekly Reports were maintained by most non-clerical employees of the Union, (*id.* at 386), and he testified that he looked through the file cabinet maintained by Myhre in which the Weekly Reports are kept, (Bitterman Dep. at 321–24, Ex. 42 to Lans Decl.), he never suggested to counsel that they might be responsive, for example, as communications relating to communications about the Met, (*see* Ex. 1 to Lans Decl.). Also, although Bitterman testified that he understood after July of 2001 that computers were to be searched for documents and he knew that e-mails were to be requested from ISPs, he has no memory of what he did with respect to certain computers, (Bitterman Dep. at 355–56, 363, 442–43, Ex. 42 to Lans Decl.), and personally looked only at his laptop and the computer nearest to him, (*id.* at 349). Also, he admittedly failed to contact all of the Union's ISPs. (*Id.* at 27–28).

Perhaps most indicative of Bitterman's lack of good faith effort is that he never checked back with the few employees he did speak with to be sure they were complying with his instructions, such as they were. (*See, e.g.,* Travis Dep. at 105, Ex. 49 to Lans Decl. (although Bitterman did at some point

tell Travis to turn over e-mails, she admittedly forgot to do so)). A review of, *inter alia,* the entirety of Bitterman's compliance deposition convinces me that his document production efforts were purposely scattershot, intended only to go through the motions.

Such a haphazard effort at collecting responsive documents is insufficient. More is required—even of an inadequately instructed layperson. Bitterman failed to communicate with all Union employees who were likely to have relevant documents, including such obvious persons as Rimmelin, the office manager and keeper of the storage facility inventory. He failed to execute specific, narrow instructions, such as contacting all the Union's ISPs, and failed overall to put into place any organized method of collecting responsive documents, instead assuming that those employees he did speak to would remember to put "Met-related" documents in the designated box. As the court wrote in *Radiation Survivors,* "a [reasonable] inquiry would have required, at a minimum, a reasonable procedure to distribute discovery requests to all employees and agents of the defendant potentially possessing responsive information, and to account for the collection and subsequent production of the information to plaintiffs." 115 F.R.D. at 556. Even adjusting for Bitterman's lay status, he, and thus the Union, failed "to establish a coherent and effective system to faithfully and effectively respond to discovery requests." *Id.* Instead, the Union, through Bitterman, "employed an unconscionably careless procedure to handle discovery matters, suggesting a callous disregard for its obligations as a litigant." *Id.*

Finally by way of example, just after the Met informed defendants' counsel (and the Court) that it might request permission to engage a forensic computer expert to attempt to retrieve deleted material from the Union's computers, those computers were

---

**35.** Granfield, the then-incoming Union president, also reflects the Union's less than good faith approach to document discovery. For example, as noted, he saves documents on a diskette and, when it is full, simply deletes material. (Granfield Dep. at 530–35, Ex. 43 to Lans Decl.). He never provided the diskette to counsel, (*id.* at 405), and never told Yen about his deletions, (*id.* at 534). Also, while searching computers he

used, he looked only at document titles, even though he knows how to use the "find" tool. (*Id.* at 410).

Tamarin, the then-outgoing Union president, was also grossly inadequate in his own document search. For example, he never even looked at the documents in his Chicago office. (Tamarin Dep. at 67, Ex. 48 to Lans Decl.; *see also* Lans Decl. ¶ 51; Lans Reply Decl. ¶ 60(e)).

dismantled without notice to Met counsel. (Granfield Dep. at 408–09, Ex. 43 to Lans Decl.; Lans Decl. ¶ 75, n. 28). The Union's complicity in the discovery failures weighs in favor of sanctions against the Union itself.

### d. Prejudice

 First, the Union's assertion that the Met must show prejudice before a sanction may be ordered under Rule 37 is without merit. For example, in *Miller v. Time–Warner Communications, Inc.,* No. 97 Civ. 7286, 1999 WL 739528 at *3 (S.D.N.Y. Sept. 22, 1999), the court found dismissal warranted even though there was no prejudice to the moving party because the record indicated that the non-moving party and her attorney had committed perjury. Similarly, the court in *Skywark v. Isaacson* granted judgment when the plaintiff, "rather than having fully corrected his misdeeds, . . . filled the record with desperate excuses and additional lies to try to cover-up earlier wrongdoings." No. 96 Civ. 2815, 1999 WL 1489038, at *16 (S.D.N.Y. Oct. 14, 1999). Thus, the Union is wrong on the law.

Second, in any event, the Met has demonstrated that it has been prejudiced by the Union's discovery failures. Because of counsel's failure to instruct their clients properly about discovery obligations, the Union's haphazard search and both the Union's and counsel's failure to check that an adequate search was made, it is beyond peradventure that many documents have been destroyed that related directly to events taking place during the most critical time period in this action, that is, when the Union planned its campaign against the Met, decided what its leaflets, letters and other public statements would say and on what basis. (*See* Lans Decl. ¶¶ 27–28, 31, 36 (e-mails from the Union); ¶¶ 29, 30, 35, 55, 71–72 (computer files and drafts of documents); ¶ 51 (letters); ¶¶ 43, 62, 65 and Exs. 40 and 41 (missing Weekly Reports); ¶¶ 58 and 63 (documents regarding Union subsidies); and ¶ 59 (documents regarding Union benefits); *see, e.g.,* Lans Reply Decl. ¶¶ 32–49, 59, 64, 67–76). Those documents, from that most critical period, have not been retrieved. Moreover, the documents that have been produced were often produced in an untimely, disorganized fashion, after numerous letters and telephone calls were exchanged and court conferences held and after the depositions of the relevant witnesses. The Met was not only denied the opportunity to prove its case but was denied the opportunity to plan its strategy in an organized fashion as the case proceeded. The situation here is comparable to that summarized by then-District Judge Sotomayor as follows:

> For more than a year, [defendant] has spent all of its time and effort trying to obtain from [plaintiff] the production of documents that comply with its *first document request* and responses to comply with its *first set of interrogatories.* Numerous calls, letters, conferences, court appearances and the filing of motions were necessary before [plaintiff's] counsel deemed it appropriate to offer last-minute, inadequate explanations for its failure to comply with discovery and this Court's orders. To state that the cost associated with the above is great is to have a penchant for the obvious which I will not indulge in.

*535 Broadway Assocs.,* 159 B.R. at 409–410 (emphasis in original).

In addition, documents that were produced were not produced as required by Rule 34, that is, in the manner in which they were maintained or according to request number, *see* Fed.R.Civ.P. 34(b), and many important documents were produced after the depositions of key witnesses. All of these obstructions prevented the Met from adequately planning and preparing its case; it was forced to proceed with depositions before relevant documents were produced, it was no doubt hampered in opposing summary judgment and, ultimately, in preparing for trial. The Union's continued reference to the large number of pages it *has* produced is irrelevant in the face of conclusive evidence that at least a year's worth of electronic documents from the time period most critical to the action have been destroyed while Met counsel continually called attention to the failure. *See Handwerker v. AT & T Corp.,* 211 F.R.D. 203, 210–11 (S.D.N.Y.2002) ("belated production of discovery that may or may not be complete does not save [plaintiff's] conduct of the past nine months from sanction").

This factor weighs in favor of a severe sanction.

### e. Effectiveness of Lesser Sanctions

Finally, I find that lesser sanctions, such as an adverse inference or preclusion, would not be effective in this case. I acknowledge the judicial system's preference for resolving cases on the merits. *See, e.g., Cody v. Mello,* 59 F.3d 13 (2d Cir.1995). Here, however, the Union's wholesale destruction of documents, by omission or commission, has made that preferred path impossible. As is clear from the factual recitation, untold numbers of documents from the time period most critical to the case are irretrievable. Unlike the situation in *Residential Funding,* an adverse inference or other lesser sanction is insufficient to "restor[e] the evidentiary balance," 306 F.3d at 108, because it is impossible to know what the Met would have found if the Union and its counsel had complied with their discovery obligations from the commencement of the action. *See Handwerker,* 211 F.R.D. 203, 209–10 ("[P]recluding [plaintiff] from introducing evidence [will not] provide an effective remedy because the misconduct at issue is [plaintiff's] self-serving withholding of information that may assist [defendant in] prepar[ing] its case."). Also, there is no indication that lesser sanctions would bring about compliance, and "there is no meaningful way in which to correlate [defendants'] discovery failures with discrete issues in the case." *See A.V. by Versace,* 2002 WL 54610, at *8.

Finally, because of the egregiousness of the conduct at issue and because it continued in the face of repeated, documented examples of non-compliance and repeated inquiries by Met counsel and the Court, a lesser sanction would not be adequate to penalize the Union and its counsel here or to deter others from similar misconduct in the future. *See Miller,* 1999 WL 739528, at *3. Thus, this factor also counsels the most severe sanctions. Accordingly, all of the factors generally considered under Rule 37 call for imposition of the most severe sanction.

### 3. 28 U.S.C. § 1927

As set forth above, I have found that Union counsel's failures to comply with their discovery obligations and their unreasonable obstruction and delay of discovery to be "so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Oliveri,* 803 F.2d at 1273. Also, the factual recitation leaves no doubt that counsel's conduct multiplied the proceedings "unreasonably and vexatiously." The time and effort spent on discovery follow-up letters and conferences with counsel and the Court was far beyond what is normal, even in a contentious, hard-fought litigation, and all of the compliance discovery well beyond normal parameters. Accordingly, sanctions are also appropriate under § 1927.

▮▮▮ Defendants incorrectly argue that they are required to have received an explicit warning that they might be sanctioned. To the contrary, "[p]arties and counsel have no absolute right 'to be warned that they disobey court orders at their peril,' " *Reilly,* 181 F.3d at 270 (quoting *Daval Steel Prods.,* 951 F.2d at 1366), and the Court of Appeals has "declined to impose rigid requirements on either the timing or the form of the notice afforded to a sanctioned party." *Id.* Nevertheless, Met counsel warned the Union on several occasions that if appropriate responses to the Met's discovery requests were not forthcoming, sanctions would be sought. (*E.g.,* Letter from Stillman to Anderson dated June 28, 2001, Ex. 11 to Lans Decl.; Letter from Easterly to the Court dated December 18, 2001 at 7, Ex. 29 to Lans Decl.).

### 4. The Met Directors' Depositions

Perhaps of particular relevance under § 1927 is Moss' and Yen's behavior with respect to the Met Directors' depositions. As is set forth in detail above, with approximately one month to go to the completion of discovery, I ordered limited depositions of six Met Directors, over Met counsel's objections, together with expedited document production from those individuals. With both the discovery deadline and the holidays approaching, Met counsel spent time over approximately a two-week period preparing the six witnesses and finalizing December 18, 19, 20,

27 and 28 as the dates for their depositions. On December 13, the Thursday before the first scheduled Tuesday deposition, Union counsel informed Met counsel that, except for one of the six Directors, the Union no longer wished to pursue the Directors' depositions. By way of explanation, Yen explains essentially that she and Moss changed their strategy and determined that it would be more advantageous to depose other Met-related individuals than the Directors and that they delayed notifying Met counsel of their decision because of the "previous difficulty in serving the Met's directors." (Yen Aff. at ¶ 12).

Although Moss' and Yen's delay in notifying Met counsel of their decision to cancel the Met Directors' depositions was rude and costly, both in fees and in precious time during the holiday season just before the close of discovery, I cannot say with confidence that counsel's conduct was so lacking in merit as to constitute bad faith. Accordingly, the Met's motion for fees for cancellation of the Met Directors' depositions is denied under § 1927 and, because it also requires a finding of bad faith, the Court's inherent power. Although bad faith is not required under Rules 26 and 37, the motion is also denied under those rules in light of counsel's explanation of their tactical reasons for the delay in notice.

### 5. The Court's Inherent Power

As noted above, necessary to the Court's conducting judicial business in our adversary system is the inherent power to sanction those who deviate from the standards of good faith. *See Chambers,* 501 U.S. at 43, 111 S.Ct. 2123 (quoting *United States v. Hudson,* 7 Cranch at 34, 3 L.Ed. 259). Equally necessary to continuing to conduct judicial business is actually exercising that power and sanctioning counsel and parties who in bad faith fail to abide by the rules and fail to conduct themselves honestly. *See Cine Forty–Second St.,* 602 F.2d at 1064 (unless sanctions are "perceived as a credible deterrent rather than a 'paper tiger,' . . ., the pretrial quagmire threatens to engulf the entire litigative process.") (internal citation omitted). As has been set out at length above, defen-

dants and their counsel are squarely in this category. To fail to use the Court's inherent power to sanction on the facts presented here would diminish the Court's authority and the adversary system and would serve as a license, encouraging similar behavior. Accordingly, the Met's motion for sanctions pursuant to the Court's inherent power is also granted.

## VI. CONCLUSION

Plaintiff's motion for judgment as to liability against defendants and for additional sanctions in the form of attorneys' fees necessitated by the discovery abuse by defendants and their counsel (docket entry no. 42) is granted against defendants and their counsel.

Plaintiff's motion for sanctions with respect to the Ward deposition is granted, and its motion for sanctions with respect to the Met Directors' depositions is denied.

Counsel shall confer and inform the Court by letter no later than February 5, 2003, as to the steps necessary to resolve the action. Counsel shall appear for a conference on February 10, 2003 at 4:00 p.m. in Courtroom 12A.

SO ORDERED.